**J. Reid BINGHAM, as Ancillary Administrator of the Estate of Robert Nesta Marley, Plaintiff,**

**v.**

**Marvin ZOLT; Zolt and Loomis, P.C.; David J. Steinberg; Bluestein, Rutstein & Mirachi, P.C.; Greenstein, Gorlick, Price, Silverman & Laveson; Martin Oliner; Martin Oliner, P.C.; and Coudert Brothers, Defendants.**

No. 86 Civ. 9477 (KC).

United States District Court,
S.D. New York.

April 15, 1988.

Robert W. Brundige, Jr. and Anthony Cottone Hughes Hubbard and Reed, New York City, for plaintiff.

Lawrence P. Eagel, Squadron, Ellenoff, Plesent & Lehrer, New York City, for defendant Zolt & Zolt & Loomis.

Robert E. Welsh, Jr., Montgomery, McCracken, Walker and Rhoads, Philadelphia, Pa., for defendant David Steinberg.

Oliva M. Gross, Newman Schlau Fitch and Burns, New York City, for defendant Bluestein, Rutstein and Mirarch, P.C.

Geoffrey W. Heineman, Ohrenstein and Brown, New York City, for defendant Coudert Bros.

Edward Spiro, Kathryn Keneally, Kostelaneter, Ritholz, Tigue and Fink, New York City, for defendants Martin Oliner and Martin Oliner, P.C.

John V. Fabiani, Jr., Killarney Rein Brody and Fabiani, New York City, for defendant Greenstein, Gorelick, Price, Silverson & Laveson.

CONBOY, District Judge:

The estate ("Estate") of Bob Marley, who at the time of his death in 1981 commanded a global audience for his music of reggae rhythms and political and religious commitment, brings this action against several former legal and financial advisors to both Marley and, following his death, the Estate. Stripped to its essentials, the complaint alleges that the defendants fraudulently diverted three of Marley's music companies ("The British Virgin Island Companies") out of the Estate. The defendants move to dismiss the complaint on the grounds that the Court lacks subject matter jurisdiction over the action, the complaint fails to plead fraud with particularity, and the complaint fails to state claims for which relief may be granted.

The First Amended Complaint asserts the existence of a conspiracy among the defendants, accountants and attorneys in Philadelphia and New York, and alleges conversion, fraud, breach of fiduciary duty, negligence, gross negligence, and violations of the Racketeer Influenced and Corrupt Organization Act (RICO).

J. Reid Bingham is a citizen and resident of Florida. This action is brought by Bingham as Ancillary Administrator in New York of the Estate of Bob Marley.[1] De-

---

1. On December 17, 1981, Letters of Administration of the Estate were issued out of the Supreme Court of Judicature of Jamaica to Mutual Security Merchant Bank ("the Bank"), to George Desnoes, and to Rita Marley, the widow of Bob Marley. The Bank is duly organized and existing under the laws of Jamaica with its principal place of business in Kingston, Jamaica. George Desnoes and Rita Marley are both citizens and residents of Jamaica. On February 27, 1987, Ancillary Letters of Administration were issued out of the Surrogate's Court, New York County, to Bingham.

fendant Zolt & Loomis is a professional corporation of accountants organized and existing under the laws of the State of New York, with its principal place of business in New York City. Defendant Zolt is a citizen and resident of New York and an officer and principal of Zolt & Loomis. Defendant Bluestein, Rutstein & Mirarchi ("BR & M") is a professional corporation organized and existing under the laws of Pennsylvania, with its principal place of business in Philadelphia, Pennsylvania. Defendant Greenstein, Gorlick, Price, Silverman & Laveson ("GGPS & L") is a law partnership with its principal place of business in Philadelphia. Defendant Steinberg was a partner and counsel of GGPS & L from at least 1981 to about June, 1983. Since then, he has been an employee, principal, and counsel of BR & M. Coudert Brothers ("Coudert") is a law partnership with its principal place of business in New York City. Defendant Oliner is a citizen and resident of New York State. Until October, 1981, Oliner was a partner of Coudert. Since then, he has been the sole principal of Martin Oliner, P.C.

Bob Marley, a citizen and resident of Jamaica, died intestate on May 11, 1981. At the time of his death, Zolt and Zolt & Loomis had been acting as consultants and accountants for Bob Marley and his various music and publishing companies, and Steinberg and GGPS & L had been acting as consultants and attorneys for Marley and his companies. Shortly before Marley's death, Zolt and Steinberg retained Coudert Brothers, through Oliner, to act on behalf of Marley as attorneys and international tax consultants. After Marley's death, the Co–Administrators of the Estate appointed Zolt, Zolt & Loomis, Steinberg and GGPS & L to represent them as agents and representatives with respect to all Estate matters outside of Jamaica.

The plaintiff alleges at the time of or shortly after Marley's death, Zolt, Steinberg, and Oliner developed and engaged in a conspiracy and scheme to defraud the Estate and convert its assets. In response to inquiries from the Bank regarding the ownership and assets of the British Virgin Island Companies, it is asserted that Steinberg and Zolt repeatedly responded that those companies were not assets of the estate because Marley had transferred his stock interest in the companies to Rita Marley before he died. Despite these representations, Mutual Security Bank continually requested written evidence of the stock transfers. The plaintiff claims that on or about June 26, 1981, Zolt, Steinberg, Oliner, and Rita Marley met at the offices of Coudert Brothers and, at the direction of Zolt, Steinberg and Oliner, Rita Marley forged Bob Marley's signature on three share transfers and pre-dated them to June 6, 1978. In or about June 1982, it is claimed, Steinberg and Rita Marley delivered the bogus share transfers to the Bank.

According to the complaint, after Marley's death, Zolt, Steinberg and Oliner, in concert with others, (i) caused the British Virgin Island Companies to be dissolved and/or discontinued, (ii) caused the assets of those companies to be transferred to a newly formed Netherland Antilles company named Music Publishing Companies of Bob Marley, N.V., and (iii) caused the assets of the Netherland Antilles company to be transferred to a newly formed Dutch subsidiary company named Bob Marley Music Ltd. B.V. Thereafter, it is asserted, Steinberg, Zolt, and Oliner ran and operated the Netherland Antilles company and the Dutch company. All income previously paid to the British Virgin Island Companies was paid to the Dutch company, and Steinberg or Zolt received all such income directly. Allegedly, Steinberg and Zolt would deduct a percentage of the income and place the percentage in a "fee fund" account primarily for their own benefit and use. They would deposit the balance into a bank account set up and maintained by Zolt in the name of the Dutch company. The plaintiff further claims that funds in that account would, in turn, be transferred by Zolt into a bank account in the name of the Netherland Antilles company. Finally, Zolt would transfer the funds into bank accounts set up by Zolt in the names of both Rita Marley and Zolt, and the funds would

be distributed from that account, according to the complaint.

Steinberg and Zolt, in conjunction with Oliner, allegedly continued to operate the Dutch company and the Netherland Antilles company until the plaintiff discovered the conspiracy and scheme in or about September, 1986. Through the conspiracy and scheme, Steinberg, Zolt, and Oliner are said to have diverted more than $8,000,000 from the Estate, of which over $1,000,000 was paid to the defendants. Based on the foregoing allegations, Bingham asserts claims under the Racketeer Influenced and Corrupt Organization Act ("RICO") and state common law.

*The RICO Claims*

RICO authorizes a private cause of action for "[a]ny person injured in his business or property by reason of a violation of Section 1962." 18 U.S.C. § 1964(c). To state a claim for damages based on a violation of § 1962, a plaintiff must allege the following elements: "(1) that the defendant [or defendants] (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

Defendants attack the sufficiency of almost every element of plaintiff's RICO claims. The Court will first address plaintiff's failure to plead the existence of an enterprise.[2]

In *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Supreme Court indicated that two predicate acts may not be sufficient to establish a pattern of racketeering activity within the meaning of § 1962. The Court relied on the Senate Report accompanying the statute which explained: "The target

of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern."

Following *Sedima*, courts within this circuit struggled to impose the "continuity plus relationship" requirement on RICO pleadings. Initially, the majority of courts declined to find a pattern of racketeering activity where the alleged predicate acts supported only one discreet scheme or fraudulent transaction. *See, e.g., Frankart Distrib., Inc. v. RMR Advertising, Inc.*, 632 F.Supp. 1198 (S.D.N.Y.1986). In *United States v. Ianniello*, 808 F.2d 184 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 3229, 97 L.Ed.2d 736 (1987), the Court of Appeals appeared to reject the "single scheme" approach, at least in the criminal context, ruling that the pattern requirement is established by the commission of two or more of the predicate acts listed in the statute. Despite *Ianniello*, courts continued to apply the "single scheme" approach distinguishing *Ianniello* as "a criminal case which did not raise the serious problems presented by civil RICO." *Shopping Mall Investors N.V. v. E.G. Frances*, No. 84 Civ. 1469 (S.D.N.Y.1987) [Available on WESTLAW, 1987 WL 6154]. The Court of Appeals soon rejected that distinction in *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46 (2d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), ruling that two related predicate acts established a pattern of racketeering activity in civil as well as criminal cases. *Id.* at 51.

The Court, however, effectively achieved the same result reached under the "single scheme" approach by reading the requirement of "continuity plus relationship" into the enterprise element of the alleged violation.[3] According to *Beck*, a

---

**2.** The complaint names four enterprises: Zolt and Loomis, P.C., BR & M, GGPS & L, and Martin Oliner, P.C., and Coudert.

**3.** "[W]hether one looks for the requisite continuity and relatedness by examining the pattern

or the enterprise is really a matter of form, not substance." *Beck, supra,* at 51.

plaintiff must establish the existence of a *continuing* enterprise to succeed on a civil RICO claim. Because the alleged enterprise in that case "had but one straightforward, short-lived goal," it was not sufficiently continuous to constitute an "enterprise" within the meaning of 18 U.S.C. §§ 1961–62.

The Court of Appeals clarified the continuing enterprise requirement in *Albany Insurance Co. v. Esses*, 831 F.2d 41 (2d Cir.1987). There, an insurance company brought a RICO action against the insured, a corporation that imported women's shoes, and its president, Esses, alleging that the insured submitted false valuation statements and a false insurance claim via the mails. In 1982, Esses leased warehouse space in Brooklyn, New York, and thereafter prepared bills of lading that falsely reported the transfer of shoes from another warehouse to the Brooklyn warehouse. Esses also mailed monthly statements of value to the insurer that materially overstated the value of the stored merchandise. Following a fire in the Brooklyn warehouse in July, 1983, Esses filed a fraudulent insurance claim which included a sworn proof of loss statement.

The Court of Appeals rejected the plaintiff's contention that Esses and the Shoe Store constituted a continuing enterprise within the meaning of § 1962 and affirmed the district court's dismissal of the complaint. The Court reasoned that there was "nothing in Albany's ... complaint that indicates a *threat of continuing criminal activity beyond*" the finite, completed goal of defrauding the insurance company. *Id.* at 44 (emphasis added). Absent the threat of continuing criminal activity, the relationship between the defendant corporation and its owner did not constitute a continuing criminal enterprise. *See also Creative Bath Products v. Connecticut Gen. Life Ins. Co.*, 837 F.2d 561 (2d Cir.1988) (plaintiff must establish existence of enterprise whose illicit activities or unlawful goals are continuing ones).

For purposes of the enterprise analysis, the Court sees no significant difference between the fraud scheme in *Albany* and the scheme alleged in this case. As in *Albany*, the alleged enterprise had only one target—the Estate of Bob Marley—and one finite goal—the transfer of Marley's shares in the British Virgin Island Companies to Rita Marley.

That the defendants continued to control and receive income from the companies formed from Estate assets does not compel a different conclusion. To say that their continuing control of the music companies constituted ongoing criminal activity would allow plaintiffs to turn every finite scheme—or at least those involving economic crimes—into an enterprise simply by characterizing the defendant's subsequent enjoyment of the proceeds of the scheme as continuous criminal activity.

For example, if the defendants in *Albany* had placed the insurance payment in a bank account, any interest earned would certainly be unjust enrichment yet it would not have converted the straightforward short-lived goal into ongoing criminal activity. In *Creative Bath, supra*, the RICO claims arose out of allegedly fraudulent representations made by defendants in connection with the sale of certain insurance policies. The insurance policies undoubtedly required periodic premium payments but such payments did not convert an otherwise finite scheme into ongoing criminal activity. The Court is not persuaded that the fraudulent diversion of specific—albeit income-producing—assets without the threat of continuing criminal activity supports the existence of a RICO enterprise as defined by *Beck*, *Albany*, and *Creative Bath, supra*.

The defendants attack the complaint for naming each of the partnerships and P.C.s as both an enterprise through which the individual defendants acted and as a person liable for the alleged RICO violations. Under §§ 1962(a) and 1962(c), a corporation, law firm or other "association in fact" cannot be both the "enterprise" and the "person" for purposes of RICO liability. *Bennett v. United States Trust Co. of New York*, 770 F.2d 308, 315 (2d Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); *Rush v. Oppen-*

*heimer,* 628 F.Supp. 1188 (S.D.N.Y.1985). Although each firm may be an enterprise through which individual members act, the firms must have been acting through an enterprise or enterprises other than themselves in order to be liable as "persons" under RICO. *Park South Associates v. Fischbein,* 626 F.Supp. 1108 (S.D.N.Y.), *aff'd,* 800 F.2d 1128 (2d Cir.1986). Thus, plaintiff fails to state a RICO claim against Zolt & Loomis, BR & M, GGPS & L, and Coudert.

■ The complaint also fails to allege violations of §§ 1962(a) and (b) by any of the defendants. Plaintiff apparently believes he can state a claim under either of these subsections merely by invoking them. Such is not the case. The complaint is devoid of any allegation that the individual defendants invested, acquired, or maintained interests in the named enterprises through the pattern of racketeering described. Paragraph 55, which purports to state violations of §§ (b) and (c), does not even track the language of §§ (b) and (c). As drafted, the complaint suggests, incorrectly, that violations of §§ (b) and (c) arise automatically from the allegations of predicate acts in paragraph 54.

■ Even if the complaint properly alleged violations of subsections (a) and (b), it would fail to state a claim under these provisions because it does not allege that plaintiff was "injured in his business or property by reason of" the violations. *Kaufman v. Chase Manhattan Bank, N.A.,* 581 F.Supp. 350 (S.D.N.Y.1984). The Court declines to interpret that omission as an oversight on plaintiff's part since the complaint expressly alleges that the Estate was injured by the violations of subsections (c) and (d).

Although some of the complaint's deficiencies might be cured by amendment, granting leave to replead in this case "would serve no useful purpose." *Albany, supra,* at 45. There is no indication from either the complaint or plaintiff's memorandum of law that plaintiff could establish the "continuity plus" required by *Beck, Albany,* and *Creative Bath, supra.* Ac-

cordingly, plaintiff's RICO claims are dismissed without leave to replead.

*Diversity Jurisdiction*

The remaining common law claims are viable, of course, only if the Court has jurisdiction based upon diversity of citizenship of the parties. Defendants contend that diversity jurisdiction has been improperly manufactured in this case and, therefore, the remaining claims must be dismissed along with the RICO claims. Their argument, simply stated, is that the Estate should have chosen a New York ancillary administrator because the Estate chose a New York lawfirm to prosecute this action. They insist that Bingham was appointed to insure complete diversity between the plaintiff and defendants, several of whom are citizens of New York.

■ Ordinarily, when a suit is brought by an administrator, the citizenship of the administrator and not that of the decedent controls for jurisdictional purposes. *O'Brien v. Avco Corp.,* 425 F.2d 1030 (2d Cir.1969). An exception exists when the administrator or other representative party is appointed solely to create diversity of citizenship. *Id.* Such an appointment runs afoul of 28 U.S.C. § 1359 which provides:

A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court.

*See O'Brien, supra; Trager v. New Rochelle Hospital Medical Center,* 453 F.Supp. 516, 519 (S.D.N.Y.1978). Defendants argue that plaintiff's citizenship should not be considered in determining whether jurisdiction exists because he was chosen as ancillary administrator solely to create diversity jurisdiction. Plaintiff contends that § 1359 is inapplicable to this case because there were substantial legitimate motives for appointing plaintiff as ancillary administrator apart from the creation of diversity jurisdiction. After careful consideration of the authorities cited by the parties, the Court concludes that 28 U.S.C. § 1359 is not implicated by the facts of this case.

In *O'Brien, supra,* at 1033, the Court of Appeals found "no excuse for engulfing the already overburdened federal courts with cases involving controversies between *citizens of the same state* who seek to invoke federal jurisdiction through sham transactions (emphasis added)." There, the decedent's wife, a citizen of New York and administratrix of decedent's estate, brought suit against a New York defendant in state court. Fearing that the case would be transferred to another county, she resigned as administratrix and appointed a New Jersey administrator for the admittedly limited purpose of prosecuting the action in a federal court. The Court found that the administrator had been improperly joined within the meaning of § 1359. Like *O'Brien,* the majority of cases applying § 1359 involve the appointment of a nonresident representative to initiate an otherwise local controversy in federal court. These cases reflect the view "that a *primarily local controversy* should be tried in the appropriate state forum and that nominal or formal parties, who do not have a significant interest in the outcome of the litigation, should not be able to use the federal courts." C. Wright & A. Miller Federal Practice & Procedure § 1556 at 711 (emphasis added). Courts have also ignored the citizenship of formal parties where the underlying suit was between aliens and thus not within the court's diversity jurisdiction. *See, e.g., Betar v. De Havilland Aircraft,* 603 F.2d 30 (7th Cir. 1979), *cert. denied,* 444 U.S. 1098, 100 S.Ct. 1064, 62 L.Ed.2d 785 (1980). The common thread running through all of these cases is that the appointment of a representative should not be allowed to create jurisdiction when the citizenship of the party who has the actual stake in the litigation would defeat jurisdiction.

In the present case, the party with the actual stake in the litigation is the estate of Robert Marley, a *Jamaican* entity. This action was commenced by Mutual Security Bank, the *Jamaican* Co–Administrator of the Marley estate. Bingham petitioned the New York Surrogate's Court to become ancillary administrator only after a question was raised as to whether a foreign administrator could maintain an action in New York on behalf of a foreign estate. Had the bank remained as plaintiff, jurisdiction would have existed under 28 U.S.C. § 1332(a)(2), which grants district courts jurisdiction over civil actions between "citizens of a State and citizens or subjects of a foreign state." Defendants contend that the bank should have chosen a New York ancillary administrator because the bank is represented by a New York law firm, but the bank's choice of a New York law firm was no more natural or inevitable than its choice of a Floridian ancillary administrator. This is not, in substance, "a primarily local controversy." Indeed, the opposite is true.

Furthermore, the Court's conclusion would not be altered by applying what several defendants characterize as the "motive/function" test. *See, McSparran v. Weist,* 402 F.2d 867 (3d Cir.1968), *cert. denied,* 395 U.S. 903, 89 S.Ct. 1739, 23 L.Ed. 2d 217 (1969). Bingham has handled the Estate's day to day affairs since September, 1986, several months before this action was commenced. By the time the lawsuit was filed, Bingham had become knowledgeable and had taken control of all aspects of the administration of the Estate outside of Jamaica. With the exception of Robert Brundige, the attorney of record for plaintiff in this action, no other partner at Sage Grey in New York was familiar with the case. This is hardly an example of the "blatant ... forum-shopping" found in *O'Brien, supra.* Accordingly, the Court concludes that true diversity jurisdiction exists in this matter, and that it has a firm jurisdictional basis to entertain the non-RICO claims herein.

*The Fraud Allegations*

■ Defendants contend that the complaint fails to comply with the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." As interpreted in this Circuit, the rule requires that a fraud complaint identify "1) precisely what statements were

made 2) the time and place of each such statement and the person responsible for making (or in the case of omissions, not making) the same 3) the content of such statements and the manner in which they misled the plaintiff and 4) what the defendant obtained as a consequence of the fraud." *Posner v. Coopers & Lybrand*, 92 F.R.D. 765, 769 (S.D.N.Y.1981), *aff'd*, 697 F.2d 296 (2d Cir.1982). A fraud complaint must also apprise each individual defendant of the nature of his or her participation in the fraud. *O'Connor & Assoc. v. Dean Witter Reynolds, Inc.*, 529 F.Supp. 1179, 1197 (S.D.N.Y.1981). Although Rule 9(b) provides that intent may be averred generally, fraud allegations must also provide a basis for inferring fraudulent intent. *Ross v. A.H. Robins*, 607 F.2d 545, 548 (2d Cir. 1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).

### a. Zolt and Steinberg

■ Plaintiff's fraud allegations against Steinberg and Zolt could not be clearer. The complaint alleges that soon after Marley's death, Zolt and Steinberg repeatedly told the Bank that the British Virgin Island Companies were not assets of the Estate since Marley had transferred his interest in these companies to Rita Marley before his death. The complaint further alleges, upon information and belief, that on or about June 26, 1981, Rita Marley backdated and forged share transfers in the British Virgin Islands Companies. This occurred in the presence and at the direction of Zolt and Steinberg. The allegations based upon information and belief are supported by the affidavit of G. Louis Byles, Managing Director of the Bank, and by Rita Marley's letter of resignation as co-administratrix of Marley's estate.[4] Finally, the complaint alleges that Zolt, Steinberg and Rita Marley delivered the share transfers, "falsely represented by them to be the transfers by Bob Marley of his shares in the ... British Virgin Island Companies," to the Bank. These allegation are more than sufficient under Rule 9(b).

4. The Rita Marley letter and the Byles affidavit are part of the record for purposes of the Rule 9(b) analysis. *Cf. Clairdale Enterprises v. C.I.*

### b. Oliner

Although the complaint alleges that Oliner participated in certain aspects of the scheme with Zolt and Steinberg, the only allegation that raises an inference of scienter on Oliner's part is paragraph 26. Paragraph 26, based upon information and belief, alleges that Oliner, along with Zolt and Steinberg, directed Rita Marley to forge and backdate the stock transfers. As already noted, G. Louis Byles' affidavit and Rita Marley's letter of resignation support the allegations in paragraph 26 as against Zolt and Steinberg. They do not, however, support the allegations against Oliner. According to Rita Marley's letter, she was instructed to sign the share transfers based upon the assurance that it "was necessary ... to effectuate a tax structure which had been approved by Bob with the advice of leading tax counsel in New York." Even assuming that "leading tax counsel in New York" is Oliner, the letter suggests, at best, that Bob Marley received unspecified tax advice from Oliner and that Rita Marley was convinced by Steinberg and/or Zolt that the forgeries would effectuate that advice. According to Byles, Rita Marley told him that she was directed by Zolt and Steinberg to forge the share transfers. His affidavit makes no mention of Oliner. The connection between the fraud and unidentified tax advice which may or may not have been given by Oliner to Bob Marley in his lifetime is insufficient to support plaintiff's belief that Oliner was actually present at and encouraged Rita Marley's forgery of the share transfers. The complaint contains other allegations about Oliner but, absent the allegations in paragraph 26, they do not raise an inference of fraud. Paragraphs 27–29 detail Zolt's, Steinberg's, and Oliner's handling of the British Virgin Island Companies. That conduct was entirely consistent with a good faith belief in Rita Marley's ownership of those companies. Except for paragraph 26, nothing in the complaint suggests that

*Realty Investors*, 423 F.Supp. 257, 259 (S.D.N.Y. 1976).

Oliner should have known that the companies were, in fact, wrongfully transferred to Rita Marley.

### c. The racketeering acts

Allegations of mail and wire fraud which underlie a RICO claim must also be pled with particularity, and plaintiff's failure to do so provides a separate basis for dismissal of his RICO claim. *Frota v. Prudential–Bache Securities, Inc.,* 639 F.Supp. 1186, 1192 (S.D.N.Y.1986). Nowhere in the complaint does plaintiff allege the time, place, or content of any act of mail or wire fraud. Conclusory allegations of mail or wire fraud in connection with the scheme do not substitute for the degree of specificity required under Rule 9(b). *Id.*

Plaintiff's reliance on *Beth Israel Medical Center v. Smith,* 576 F.Supp. 1061, 1071 (S.D.N.Y.1983), and *Rich–Taubman Associates v. Stamford Restaurant Operating Company, Inc.,* 587 F.Supp. 875 (S.D.N.Y.1984), is unavailing. In *Taubman,* one of several defendants contended that the complaint failed to particularize the acts of racketeering activity necessary to support a RICO claim. The court rejected that argument because the complaint adequately specified the acts of racketeering activity against the other defendants, and those acts were attributable to the movant because the complaint alleged that the movant was part of a conspiracy. The complaint also pled facts sufficient to support the conspiracy allegation. In the case at bar, plaintiff has not sufficiently particularized his allegations of mail and wire fraud against any of the defendants, and none of the enterprise defendants is charged with conspiracy. As to the conspiracy allegations against Oliner, "a conspiracy requires factual allegations showing a meeting of minds.... conclusory allegations are insufficient." *Goldschmidt v. Patchett,* 686 F.2d 582, 585 (7th Cir.1982); *Taubman, supra,* at 879 n. 5 (fact allegations adequately supported conspiracy charge). Except for paragraph 26, the complaint does not raise an inference that Oliner was part of the conspiracy.

In *Beth Israel,* plaintiff's failure to specify particular acts of mail or wire fraud was not fatal to the complaint because the complaint otherwise described the defendants' scheme in great detail and, therefore, it was "certainly reasonable to infer that mail and/or telephone communications were used in furtherance of the defendants' scheme." *Id.* at 1071. Judge Lasker's reasoning in *Beth Israel* applies, at best, only to Zolt and Steinberg. Moreover, the complaint's failure to adequately particularize the predicate acts alleged against the enterprise defendants is not cured by the sufficiency of the pleadings as against Zolt and Steinberg because vicarious liability is not a proper basis for a finding of liability under RICO. *Frota, supra,* at 1192.

### Time Bar Defenses

Defendants contend that the statutes of limitations governing Bingham's state law claims have expired. Bingham responds that under the doctrine of equitable tolling the applicable limitations periods were tolled until 1986 when the Estate discovered the scheme. Under New York law, "a defendant may be estopped to plead the Statute of Limitations where plaintiff was induced by fraud, misrepresentation, or deception to refrain from filing a timely action." *Simcuski v. Saeli,* 44 N.Y.2d 442, 406 N.Y.S.2d 259, 262, 377 N.E.2d 713, 716 (1978). Where fraudulent concealment is alleged, the limitations period does not begin to run until plaintiff discovers, or by reasonable diligence should have discovered, the facts giving rise to his claim. *Donahue v. Pendleton Woolen Mills, Inc.,* 633 F.Supp. 1423 (S.D.N.Y. 1986). In the present case, it appears, for purposes of this analysis, that facts necessary for the Estate to discover that it had a claim were fraudulently concealed and misrepresented.

Shortly after Marley's death, the bank attempted to ascertain the ownership of the British Virgin Island Companies. Despite assurances from Marley's legal and financial advisors that the companies were not assets of the Estate, the bank demanded written evidence of the stock transfers. In June, 1982, Zolt, Steinberg and Rita Marley

gave the bank the forged share transfers, according to the complaint. Accepting the allegations in the complaint as true, as must be done at this stage, plaintiff could not, with reasonable diligence, have discovered the fraud until June, 1986, when Marley's former manager told the bank that the share transfers were forged.

■ Inexplicably relying on *Hurley v. Hurley*, 279 A.D. 415, 110 N.Y.S.2d 299 (1st Dep't 1952), *aff'd*, 306 N.Y. 647, 116 N.E.2d 491 (1953), several defendants argue that Rita Marley's participation in the fraud gave the Estate constructive knowledge of the fraud and, therefore, the Estate is not entitled to the benefit of equitable tolling. *Hurley*, however, had nothing to do with constructive notice let alone constructive notice in these circumstances. Here, the controlling and eminently sensible rule is that knowledge of actions taken by an agent adverse to the principal's interests will not be imputed to the principal. 42 N.Y.Jur., Notice and Notices § 4 at 384–85. Rita Marley's asserted participation in a scheme to divert assets of the Estate was certainly adverse to the Estate and her knowledge of the scheme will not be imputed to it.

The doctrine of fraudulent concealment tolls the running of the statute of limitations only as to the defendants who committed the concealment. *Greenfield v. Kanwit*, 87 F.R.D. 129, 132 (S.D.N.Y.1980). Coudert contends that plaintiff does not allege any acts of concealment on the part of Coudert. Since Bingham seeks to hold Coudert vicariously liable for the actions of Oliner, Coudert's argument stands or falls on whether Bingham alleges that Oliner engaged in any acts of fraudulent concealment. The only fraudulent act attributed to Oliner in the complaint is his presence at and encouragement of Rita Marley's forgery of the stock transfers. As already noted, that allegation is pled on information and belief and the materials submitted in support of that allegation are insufficient to raise an inference that Oliner participated in the fraud. If plaintiff's anticipated second amended complaint does not sufficiently allege acts of fraudulent con-

cealment on the part of Oliner, than Bingham's state law claims against Coudert will be time-barred and the complaint will be dismissed as against it.

■ In addition to fraudulent concealment, continuous representation by an attorney or accountant with respect to the matter giving rise to the complaint will toll the running of the limitations period until the representation ceases. *Siegel v. Kranis*, 29 A.D.2d 477, 288 N.Y.S.2d 831 (2d Dept.1968); *Wilkin v. Dana R. Pickup & Co.*, 74 Misc.2d 1025, 347 N.Y.S.2d 122 (Sup.Ct. Allegany Cty.1973). With respect to Zolt and Steinberg, the statutes were tolled until they each ceased to represent the Estate. Exactly when they ceased to represent the Estate, however, is not clear from the complaint. The second amended complaint must specify when Steinberg and Zolt ceased to represent the Estate.

*Vicarious Liability as to the Defendant Law Firms*

■ As already noted, Bingham seeks to hold Coudert vicariously liable for the actions of Oliner. Under New York Partnership Law, a partnership is liable for the wrongful acts of one of its partners if either (1) the partnership authorized the acts or (2) the acts were committed within the ordinary course of the partnership's business. New York Partnership Law § 24 (McKinney's 1977). Since the complaint does not allege that Coudert authorized the acts in question, the Court must determine whether, drawing all reasonable inferences in favor of plaintiff and presuming all factual allegations to be true, Oliner's acts could be deemed to have been committed in the ordinary course of Coudert's business.

Coudert cites *McDonnell v. American LeDuc Petroleums, Ltd.*, 456 F.2d 1170, 1187 (2d Cir.1972), and *Gerdes v. Reynolds*, 28 N.Y.S.2d 622, 646 (Sup.Ct.Nassau Cty. 1941), in support of its argument that the Court should determine from the face of the pleadings whether Oliner's acts were committed in the ordinary course of partnership business. Contrary to Coudert's assertion, however, neither case involved a dismissal for failure to state a claim.

976

Rather, each case merely involved the plaintiff's failure, at trial, to establish the partnership's liability for an individual partner's actions. Moreover, although dismissal may have been proper in a factually dissimilar case, it does not mean that dismissal is appropriate in this case.

The heart of Coudert's argument is that the alleged conduct could not have been in furtherance of Coudert's practice of law because it involved a fraudulent scheme, which is an odd and theoretical construct imposed upon the statute. Furthermore, the New York Partnership statute does not exclude fraud as a wrongful act giving rise to vicarious liability, and partnership's have been held liable for the fraudulent conduct of individual partners even when the other partners had "not the slightest connection with, knowledge of, or participation in the fraud." *Model Building & Loan Association v. Reeves*, 114 Misc. 137, 186 N.Y.S. 759 (1921), *rev'd*, 201 A.D. 329, 194 N.Y.S. 383 (1922), *rev'd*, 236 N.Y. 331, 140 N.E. 715 (1923).

The complaint alleges that Coudert Brothers, through Oliner, was retained by Zolt and Steinberg to act on behalf of Bob Marley as attorneys and international tax consultants. The complaint further alleges that after Marley's death, Oliner, in conjunction with Zolt and Steinberg, defrauded Marley's estate through, inter alia, the execution of false legal document's and the dissolution and creation of corporations. The Court cannot say, as a matter of law, that the alleged acts of Oliner were beyond the scope of his authority. That is an issue of fact not properly resolvable on a motion to dismiss.

Coudert contends that no fiduciary duty existed between Coudert and the Marley estate and, therefore, no breach of fiduciary duty can be found as to Coudert. Coudert also argues that in the absence of an attorney client relationship, plaintiff cannot sustain a negligence action against Coudert.

For an attorney to act as a legal representative, a contract of employment, either express or implied, must exist between the attorney and the party for whom he purports to act. *People v. Brown*, 9 Misc.2d 715, 174 N.Y.S.2d 147 (1958). Even where an attorney is authorized to act as a legal representative, the death of the client terminates the relationship. *Gross v. New York State Teachers Retirement System*, 81 Misc.2d 964, 366 N.Y.S.2d 777 *rev'd on other grounds*, 50 A.D.2d 980, 376 N.Y.S.2d 36 (3d Dept.1975). After the client's death, the attorney may not act further until he is authorized to do so by the successor in interest of the former client. *Pfeffer v. Gramse*, 50 N.Y.S.2d 74 (Sup.Ct.1944). If no attorney client relationship exists creating a duty of care on the part of the attorney, there can be no action for negligence against the attorney under New York law. *Hashemi v. Shack*, 609 F.Supp. 391 (S.D.N.Y.1984).

As already noted, Oliner was retained by Steinberg and Zolt to represent Marley before his death. The complaint goes on to detail Oliner's joint participation in the scheme to defraud the Estate, but it does not state that Oliner was retained by Steinberg and Zolt or by the Estate Administrator after Marley's death. In *Hashemi, supra.* at 393, the court observed that "[f]ormality is not an essential element in the employment of an attorney, and 'since "[t]he initial arrangement for representation are often informal ... it is necessary to look at the words and actions of the parties." '" (quoting *People v. Ellis*, 91 Misc.2d 28, 397 N.Y.S.2d 541, 545 (N.Y. Sup.Ct.1977)). That statement, however, goes to the question of proof and not to the sufficiency of the pleadings. Read broadly, the complaint does not allege that Oliner acted as an attorney for the Estate.

In his affidavit in opposition to defendants' motions to dismiss, Bingham annexes a photocopy of a bill dated January 4, 1982, from Coudert Brothers to the Estate for "professional services rendered." While the bill may establish that Oliner did, in fact, represent the Estate, the Court is constrained to consider only the complaint, documents attached to it as exhibit, and documents incorporated in the complaint by reference. *Goldman v. Belden*, 754 F.2d 1059, 1065–66 (2d Cir.1985). Unlike the

Byles affidavit and the Rita Marley letter, the Coudert bill as well as the allegation that Coudert represented the Estate come as a complete surprise to Coudert. If plaintiff wishes to allege that Coudert, through Oliner, had an attorney-client relationship with the Estate, he should amend his complaint to do so.[5]

In sum, Count VI is dismissed with prejudice. Counts I, II, III, IV, V, and VII are dismissed as against Oliner, Oliner, P.C., and Coudert with leave to replead. Defendants' motions to dismiss are in all other respects denied.

SO ORDERED.

---

**5.** If plaintiff amends his complaint to allege that Oliner represented the Estate until September of 1986, than, under the doctrine of continuous representation, plaintiff's state law claims against Oliner will be timely. According to the complaint, Oliner ceased acting on behalf of Coudert in October, 1981. There is no allegation in the complaint that Coudert represented the Estate after Oliner ceased acting on Coudert's behalf. Consequently, the doctrine of continuous representation is insufficient to toll the statutes of limitations governing the state claims against Coudert even if the applicable limitations periods did not begin to run until October, 1981.