(101 App. Div. 48)

BINGHAM v. SHELDON.

(Supreme Court. Appellate Division, Second Department. January 27, 1905.)

1. ATTORNEY AND CLIENT—EXISTENCE OF RELATION—FAIRNESS OF TRANSACTIONS—BURDEN OF PROOF.

An attorney, whose relation with his client began in the settlement of a claim for her, and who, after receiving payment for his services, interested her in a stock purchase, and continued thereafter to correspond with her as a client, and gave confidential advice, was, in the absence of a distinct understanding between them that the relation of attorney and client had ceased, subject to the rule requiring an attorney to affirmatively show that dealings advantageous to himself have been fair and just, that his client has acted on full information of all the material circumstances, and that he has not taken undue advantage of his client's confidence or misconception.

2. FRAUD—FIDUCIARY RELATIONS—SCOPE OF RULE.

The rule requiring a person standing in a fiduciary relation to another to show that transactions inuring to his own benefit were just and fair is not limited to cases of attorney and client, guardian and ward, trustee and cestui que trust, or other similar relations, but holds good wherever fiduciary relations exist, and there has been a confidence reposed which invests the person trusted with an advantage in treating with the person confiding.

Appeal from Trial Term, Kings County.

Action by Jennie D. Bingham against Paul Sheldon. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Affirmed.

Argued before HIRSCHBERG, P. J., and BARTLETT, WOODWARD, JENKS, and HOOKER, JJ.

John McCrone, for appellant.
Frederick C. McLaughlin, for respondent.

WOODWARD, J. The plaintiff in this action is a widow, 58 years of age, and a person who appears to have been singularly innocent and confiding in reference to her business affairs. It appears that she had some kind of a claim against the Arizona Copper Company, and early in the spring of 1901 she left her home, near Boston, and came to New York to make inquiry about this claim, aggregating something like $4,000. She went to the office of the Arizona Copper Company, and was told that her claim was not against that company; but the party whom she found in the office told her that he could direct her to the proper person—a Mr. Simmons, in the same building. This Mr. Simmons introduced her to the defendant as a gentleman and a lawyer to prosecute her claim against the copper company, and it is alleged that Mr. Simmons was the secretary of such company. After some negotiation the copper company agreed to give the plaintiff $1,000 in settlement of her claim, and this amount, less $250 retained by the defendant as counsel fee, was subsequently paid over to the plaintiff. Before she left the city, however, the defendant called upon her to bid her good-by; and, as an incident to that visit, he sold the plaintiff 10 shares of stock in the Colonial Exploitation & Trading Company of New York, taking $700 in cash, and her promise to pay $300 more at a subsequent time; telling her a very ingenious story of his good fortune in being able to secure this stock for her, and promising a dividend of $10 per share in the following January. This certificate of stock was subsequently delivered to the plaintiff, and, although there are allegations of fraud in connection with this transaction, the learned court withdrew this from the consideration of the jury, and no question is raised upon this appeal; the transaction having no other purpose, as evidence, than to show the course of dealing.

Soon after the above transaction, which occurred on the 27th day of April, 1901, the defendant went to South America, ostensibly on business for the exploitation company; and he took occasion, while absent, under date of Trinidad, B. W. I., Port of Spain, May 15, 1901, to write a letter to the plaintiff, telling her of his trip, his hopes, the prospects of the business, etc.; closing with, "Please take good care of yourself and try to avoid being worried by any one." Then follows a postal card telling of the bright prospects of the company, followed by a letter from the secretary and treasurer of the company giving official assurances. On the 18th of June the defendant writes to the plaintiff from the home office, in New York, apparently full of enthusiasm and regard for the plaintiff, and assures her that, "If all clients were as satisfactory and pleasant as you have been, this profession would be much more

attractive;" thus recognizing her as one of his clients on the 18th day of June, 1901. On July 2, 1901, the defendant writes the plaintiff in reference to some stocks which she held in another company, and hoped "to be able to advise you just what to do." In the same month the defendant visited the plaintiff, in Boston, and while there induced her to invest $2,500 in the stock of the American Coke & Gas Company, upon his assurance that he could purchase the stock for her, and before the 15th day of August could realize a profit of $500, giving her $3,000 for the $2,500—a thing which he apparently did at a later period. In the latter part of July the defendant again visited the plaintiff, at Boston, after some intermediate correspondence; and, on the plaintiff making inquiries as to the $2,500 investment, defendant told her that he had sold the stock for $3,000, but that he could not get the money until the 15th of August. He then told her that he was very sorry that he had sold the stock, as it was going very much higher; that he had been elected president of the company, and he knew what it would do; adding that he had an opportunity to purchase 75 shares more of the stock for the plaintiff if she could raise $4,500. After some explanation of her financial affairs, the plaintiff testifies that she told the defendant that, if he thought it the thing to do, she would do it, and the transaction resulted in the defendant getting $4,500, for which he gave the following receipt:

"Parker House, Boston, July 27, 1901.

"Received this day from Jennie Bingham, Forty-five hundred dollars for seventy-five shares of the capital stock of the American Coke & Gas Co. of the par value of $100 each. Certificate to be delivered one week from date.

"Paul Sheldon."

The plaintiff testifies that she never received the certificate of stock for this 75 shares of stock, and the defendant concedes that she has not; his defense being that there was an understanding between himself and the plaintiff that he should be liable upon this $4,500 as upon a loan, the defendant having promised to return the same to the plaintiff on demand.

The record contains much further correspondence between the parties, in which it appears that the plaintiff insisted at all times that she was relying upon his integrity and judgment in these matters, and the defendant as plainly indicates that he understands that he is acting as her adviser, the transactions including correspondence over claims pending in Chicago against a railroad company and other matters; but although the defendant has returned the $2,500, with the $500, bonus, the plaintiff is still out about $4,000 on the transaction, for which she has a judgment, which the defendant is seeking to have overturned in this court mainly upon the ground that he was simply a borrower of the $4,500, and that this contract debt cannot be recovered in an action for fraud. This would undoubtedly be the case if it was clearly established that the transaction was merely a contract debt, free from fraud; but we are clearly of opinion that the transactions thus briefly set forth were such as to call upon the defendant to clearly establish that his dealings with the plaintiff were free from the taint of fraud. He offered no evidence in his own behalf, relying upon what he conceived to be the law of the case; and, the jury having found in favor of the

plaintiff upon the undisputed facts, only questions of law are presented upon this appeal.

Upon this appeal it appears to be the contention of the defendant that, when he was paid for his services in the settlement of the Arizona Copper Company deal, he ceased to be the attorney of the plaintiff, and that his subsequent dealings with her were upon the basis of individual transactions of a business character. But this payment for services was made about the 19th of April, and the defendant, in going up to take leave of his client, interested her in a stock purchase, and the relations which began in his employment as attorney were continued through this entire series of transactions—the defendant referring to the plaintiff as his client on the 18th day of June, and the entire correspondence being based upon an assumed confidential understanding between the parties; and the defendant, being the one possessed of special information, and assuming to give confidential and special advice, can hardly claim with any degree of good faith that the plaintiff understood she was dealing at arm's length in business transactions with the defendant. He had come into her business affairs as a lawyer and a gentleman; he had come into her confidence because he was a lawyer;' and, in the absence of a distinct and unequivocal understanding between them that this relationship had ceased, we are of opinion that the defendant was subject to the rule that, in transactions between attorney and client, the former is bound to show that his dealings have been fair and just, that his client acted on full information of all of the material circumstances, and that he did not take undue advantage of his client's complacency, confidence, ignorance, or misconception. Place v. Hayward, 117 N. Y. 487, 497, 23 N. E. 25, and authority there cited. The rule is not limited to cases of attorney and client, guardian and ward, trustee and cestui que trust, or other similar relations, but it holds good wherever fiduciary relations exist, and there has been a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding. Freelove v. Cole, 41 Barb. 318; Ford v. Harrington, 16 N. Y. 285. When this relation is shown to exist, it imposes the burden of proof upon the person taking securities, or making contracts inuring to his benefit, to show that the transaction is just and fair, and that he has derived no unfair advantage from his fiduciary relation. Fisher v. Bishop, 108 N. Y. 25, 29, 15 N. E. 331, 2 Am. St. Rep. 357. In the last above cited case it was said:

"One who has, by reason of his supposed ability and integrity, been employed by another as a confidential adviser to transact the business of obtaining surety from an insolvent debtor, and who draws the transfer of property for that purpose, occupies a confidential position towards his employer, which, in good faith and common honesty, should preclude him from taking advantage of his situation, and using the information thus acquired to the detriment or disadvantage of his employer."

See Matter of Fitzsimons, 77 App. Div. 345, 350, 79 N. Y. Supp. 194, and authorities there cited.

As all of the defendant's exceptions are based upon the theory that he had a right to deal with the plaintiff upon a basis of equality, and as the facts and circumstances disclosed by the evidence and undisputed show that he occupied a fiduciary relation toward the plaintiff, it

does not seem necessary to review his various points. It is sufficient that they have been examined without disclosing reversible error. The judgment rendered appears to be a proper one, and it ought not to be disturbed.

The judgment and order appealed from should be affirmed, with costs. All concur.