**Georg H.G. HEINE and Chrisal Investments Ltd., Plaintiffs,**

v.

**COLTON, HARTNICK, YAMIN & SHERESKY and Newman, Tannenbaum, Helpern, Syracuse & Hirschtritt, Defendants.**

No. 91 Civ. 2904 (PKL).

United States District Court, S.D. New York.

March 9, 1992.

**362**

Stults Balber Horton & Slotnick, New York City (Louis Lauer, Philip A. Byler, of counsel), for plaintiffs.

D'Amato & Lynch, New York City (Robert E. Meshel, of counsel), for defendant Colton, Hartnick, Yamin & Sheresky.

Wilson, Elser, Moskowitz, Edelman & Dicker, New York City (Marshal S. Endick, Edward A. Taylor, of counsel), for defendant Newman, Tannenbaum, Helpern, Syracuse & Hirschtritt.

## OPINION AND ORDER

LEISURE, District Judge.

In this legal malpractice action, with jurisdiction based on diversity of citizenship and the presence of a federal question, defendants, Colton, Hartnick, Yamin & Sheresky ("Colton Hartnick") and Newman, Tannenbaum, Helpern, Syracuse & Hirschtritt ("Newman Tannenbaum"), now move the Court, pursuant to Fed.R.Civ.P. 12(b)(6) and 12(c), to dismiss the claims against them raised by plaintiffs, Chrisal Investments Ltd. ("Chrisal") and Georg H.G. Heine (collectively "Heine"). For the following reasons, the motions are granted in part, denied in part.

## BACKGROUND

For the purposes of this motion to dismiss, the factual allegations in the Complaint are assumed to be true. *See Easton v. Sundram*, 947 F.2d 1011, 1014–15 (2d Cir.1991); *Allen v. Westpoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991). However, the Court need not defer to legal conclusions asserted in the Complaint. *See United States v. Bonanno Organized Crime Family*, 879 F.2d 20, 27 (2d Cir. 1989) ("the district court was constrained to accept the complaint's allegations as true but only to the extent that they were factual"); *McCoy v. Goldberg*, 748 F.Supp. 146, 153 (S.D.N.Y.1990) ("[w]hile the court [must] accept as true the allegations of the complaint ... such deference must only be paid to factual allegations and not to legal conclusions") (citing *O'Brien v. National Property Analysts Partners*, 719 F.Supp. 222, 229 (S.D.N.Y.1989) (Leisure, J.)).

This action has its roots in the activities of Alvin Ashley ("Ashley"), a former partner in the Colton Hartnick law firm. Between 1986 and 1990, Ashley allegedly induced Heine to make payments to him aggregating $2,322,309.20, purportedly for investments in real estate and fast food ventures. However, after Ashley was dismissed by Colton Hartnick in 1990, allegedly for engaging in "a large pattern of financial transactions appearing to be lacking in substance," Complaint ¶ 46, Heine came to believe that he had been the victim of a fraud. Accordingly, in April 1991, Heine commenced the instant litigation, seeking recovery for over $1.5 million in losses allegedly suffered through Ashley's fraudulent deals and through alleged im-

proprieties in the purchase and sale of a condominium in the Cityspire Building, 150 West 56th Street, New York, New York ("Cityspire condominium").

Heine's Complaint alleges 18 causes of action against Ashley, Colton Hartnick and Newman Tannenbaum. Apparently as a result of these and similar activities, Ashley pleaded guilty to five counts of grand larceny in the Supreme Court of the State of New York, New York County, on September 24, 1991. In addition, Ashley confessed judgment of $1,539,345 in favor of Heine in the instant action on February 6, 1992. *See* Affidavit of Confession of Judgment, sworn to on February 6, 1992. Following the confession of judgment, five claims remain in the Complaint: two arising out of Colton Hartnick's alleged role in Ashley's purportedly fraudulent schemes, and three concerning Colton Hartnick's and Newman Tannenbaum's alleged roles in the Cityspire real estate transaction.

According to the Complaint, the relationship between Heine, Ashley and Colton Hartnick began in 1985, when Colton Hartnick represented George Bastis ("Bastis"), a friend of Ashley's, in matrimonial litigation. In connection with this litigation, Heine agreed to be deposed and provided Colton Hartnick with Chrisal documents that were relevant to the matrimonial proceeding. Colton Hartnick arranged for Heine to be represented by Morrison Cohen Singer & Weinstein ("Morrison Cohen") during the deposition. However, Heine alleges that, throughout these proceedings, he "looked upon Colton Hartnick as his actual counsel." Complaint ¶ 10.

### A. *Ashley's Deals*

Subsequently, under unspecified circumstances in January 1986, Ashley proposed a deal to Heine, in which Heine would pay money to Ashley personally, allegedly for use in "a profit making venture, such as real estate development and sales or fast-food operations." Complaint ¶ 11(a). In return, Heine would receive a series of post-dated checks written by Ashley personally and guaranteed by Ashley personally and "as a partner in Colton Hartnick."

Complaint ¶ 11(d). The post-dated checks would be payable over two years, providing Heine with a return on his investment and the ultimate return of his principal. In response to this proposal, Heine alleges that he asked Ashley, in January 1986, whether the deal was lawful, and Ashley, as his attorney and as a partner in Colton Hartnick, responded that the deal met all legal requirements.

Accordingly, in February 1986, Heine provided Ashley with a check for $30,000, and received in return five checks written by Ashley personally, totaling $45,000: four checks for $3,750 each, dated at six month intervals from August 1986 to February 1988, and a final check for $30,000, dated February 1988. As calculated by Colton Hartnick, these checks provided Heine with a return of 25% interest annually. *See* Memorandum of Law of Defendant [Colton Hartnick] in Support of its Motion to Dismiss, Exh. A.

After Heine cashed the first $3,750 check in August 1986, Ashley proposed that Heine invest more of his own money and additional funds belonging to Chrisal, Heine's wholly owned corporation, in further deals. Heine agreed to continue participating, and wrote to Ashley a series of checks, totalling $620,000, from December 1986 to May 1987. In return, Heine received checks payable from June 1987 to May 1988, totaling $860,500, at annual rates of return ranging from 37.5% to 45%. Continuing from this time through and including September 1990, Heine continued to provide Ashley with current checks, receiving post-dated checks, with annual return rates ranging from 12% to 240%, in return. Also, beginning in June 1987, Heine began rolling funds back into these deals as checks became due. According to Heine, he ultimately provided Ashley with over $2 million, of which more than $1.5 million was never returned.

Heine asserts that he entered into and continued participating in these deals in reliance on Ashley's representation in January 1986 that the deals met all lawful requirements. Moreover, he asserts that Ashley used Colton Hartnick's facilities in

arranging the deals, that Colton Hartnick knew that Ashley was engaging in this conduct and that partners in the firm also participated in the deals. Based on these allegations, Heine concludes that he had an attorney-client relationship with Ashley and Colton Hartnick with respect to the deals, and asserts two causes of action arising out of this purported relationship.

The first cause of action asserts that Colton Hartnick committed legal malpractice for failing to advise Heine that Ashley's deals did not meet the registration requirements of the federal securities laws. The second cause of action alleges that Colton Hartnick breached its duty of ordinary care by not supervising Ashley's activities and by not preventing him from using Colton Hartnick's facilities to conduct an unregistered securities business. Colton Hartnick has moved to dismiss both of these causes of action, claiming that it did not have an attorney-client relationship with Heine with respect to the deals, and that the deals were actually a series of usurious loans that were not within the scope of the federal securities laws.

### B. The Cityspire Real Estate Transaction

The post-dated check schemes were not the only transactions in which Heine and Ashley were involved in the late 1980s. In December 1988, Heine engaged Colton Hartnick to represent him in the purchase of the Cityspire condominium. As part of this retainer agreement, Heine opened a customer's account at Colton Hartnick, and, in February 1989, Colton Hartnick represented Heine at the closing on the purchase of the condominium. In connection with the closing, Heine appointed Nancy Lang, Esq., an attorney at Colton Hartnick, as his attorney-in-fact, and funds from Heine's customer account were used to cover the expenses related to the closing.

After the closing, Heine and Ashley entered into a side agreement, which provided that Ashley would be the co-owner of the Cityspire condominium, despite documentation showing Heine to be the sole owner, that Ashley would pay maintenance fees and mortgage carrying charges and assessments relating to the condominium, that Ashley would furnish the apartment and recover the cost of the furnishings if the apartment were sold, and that Ashley would occupy the apartment.[1] There is no allegation that Colton Hartnick had any knowledge of this side agreement. See Complaint ¶ 29.

At the beginning of 1990, Heine decided to sell the Cityspire condominium, and turned to Ashley for assistance. On March 2, 1990, Ashley informed Heine that a purchaser had been located, and Heine subsequently executed a power of attorney, giving Ashley the power to take all steps necessary to execute the sale of the condominium. Pursuant to this power of attorney, Ashley retained Newman Tannenbaum to represent Heine and to handle the closing. However, despite his execution of a power of attorney, Heine has claimed that the retention of Newman Tannenbaum on his behalf was improper, because he never consented to the representation and never received communications from Newman Tannenbaum concerning the sale. In addition to being represented by Newman Tannenbaum, Heine also alleges that Ashley served as his attorney-in-fact during the closing. Moreover, Heine alleges that he continued to use Colton Hartnick as his attorneys during the sale, although he does not allege that he entered into a retainer agreement with Colton Hartnick to represent him with respect to the sale, as he did with respect to the purchase of the condominium.

Despite the confusion concerning who represented Heine during the sale of the condominium, the closing on the sale took place on July 12, 1990. The proceeds of the sale, after expenses, were $181,248.89. The funds were disbursed in five checks: one payable to Heine, for $9,702.62, and four, payable to Ashley, for the remainder of the proceeds. Heine did not receive a

---

1. Heine alleges that the agreement he ultimately signed omitted the provision that Ashley would live in the condominium as a tenant.

closing binder for the transaction until December 1990. Moreover, Ashley allegedly misappropriated the proceeds of the sale, including the check issued to Heine, invested the money in United States Treasury Bills, and has failed to turn over these funds to Heine.

The first two claims for relief arising out of the sale of the Cityspire condominium are contained in the third and fourth causes of action in the Complaint, and appear to the Court to be substantially identical. These two causes of action seek damages from Colton Hartnick for Ashley's failure to turn the proceeds of the sale over to Heine, and assert that Colton Hartnick failed to prevent Ashley from entering into the side agreement, which allegedly was void for lack of consideration; breached its contract to provide legal services for Heine with respect to the sale; and breached the fiduciary duty it assumed incident to the power of attorney that was granted to Ashley. Underlying these causes of action are Heine's claim that there was an attorney-client relationship between Heine and Colton Hartnick with respect to the sale of the condominium, and the puzzling assertion that "Ashley had actual and apparent authority to bind Colton Hartnick to the sale of the Cityspire condominium." Complaint ¶ 61.

The fifth cause of action stated in the Complaint is directed at Newman Tannenbaum. This claim for relief begins by alleging that Newman Tannenbaum was "Heine's designated attorney at the closing of Mr. Heine's sale of the Cityspire condominium." Complaint ¶ 69. The Complaint then asserts that Newman Tannenbaum engaged in malpractice and breached its duty of care towards Heine by permitting the checks from the sale of the condominium to be drawn to the order of Ashley rather than Heine, and by not assuring that Heine received the proceeds from the sale of the Cityspire condominium.

## DISCUSSION

### A. *Standard Governing Dismissal under Rule 12(b)(6)*

The Court now turns to consider the sufficiency of the Complaint under Fed. R.Civ.P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Festa v. Local 3, Int'l Bhd. of Electrical Workers*, 905 F.2d 35, 37 (2d Cir.1990); *see also Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir.1984) ("The function of a motion to dismiss 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980))).

A motion to dismiss must be denied "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)); *see also Oliver Schools, Inc. v. Foley*, 930 F.2d 248, 252 (2d Cir.1991). Although the Court must limit its analysis to the four corners of the Complaint, it also can consider documents incorporated into the Complaint by reference and information that can be judicially noticed. *Allen, supra*, 945 F.2d at 44. In addition, the Court must draw all reasonable inferences in plaintiff's favor. *Papasan v. Allain*, 478 U.S. 265, 283, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986); *Allen, supra*, 945 F.2d at 44; *Murray v. Milford*, 380 F.2d 468, 470 (2d Cir.1967); *Hill v. Sullivan*, 125 F.R.D. 86, 90 (S.D.N.Y.1989) ("[A]ll allegations in plaintiffs' amended complaint must be accepted as true and liberally construed.").

### B. *Claims Arising from Ashley's Deals*

1. Existence of Attorney–Client Relationship

The court first turns to consider whether there was an attorney-client relationship between Heine and Colton Hartnick. Un-

der New York law, "the relationship of an attorney and client is contractual, and the rules governing contract formation determine whether such a relationship has been created." *Hashemi v. Shack,* 609 F.Supp. 391, 393 (S.D.N.Y.1984); *accord Jordan v. Lipsig, Sullivan, Mollen & Liapakis, P.C.,* 689 F.Supp. 192, 195 (S.D.N.Y.1988); *see also Bingham v. Zolt,* 683 F.Supp. 965, 976 (S.D.N.Y.1988) ("For an attorney to act as a legal representative, a contract of employment, either express or implied, must exist between the attorney and the party for whom he purports to act."); *Brenner v. Miller,* 121 Misc.2d 1, 467 N.Y.S.2d 123, 124 (Sup.Ct.Rockland Co.1983) ("That one benefits from the services of an attorney does not necessarily create a *contract of employment* between the attorney and the one benefitted.") (emphasis added).

Thus, "an attorney-client relationship.... arises only when one contacts an attorney in his capacity as such for the purpose of obtaining legal advice or services." *Priest v. Hennessy,* 51 N.Y.2d 62, 68–69, 431 N.Y.S.2d 511, 514, 409 N.E.2d 983, 986 (1980). However, "[f]ormality is not an essential element in the employment of an attorney, and since '[t]he initial arrangements for representation are often informal ..., it is necessary to look at the words and actions of the parties.'" *Hashemi, supra,* 609 F.Supp. at 393 (quoting *People v. Ellis,* 91 Misc.2d 28, 35, 397 N.Y.S.2d 541, 545 (Sup.Ct.N.Y.Co.1977)).

Given the varying contexts in which the existence of an attorney-client relationship is relevant, including issues of privileged communications, disqualification in the face of conflicts of interest and legal malpractice actions, it is clear that the requirements for establishing such a relationship will vary. *See, e.g., Westinghouse Electric Corp. v. Kerr–McGee Corp.,* 580 F.2d 1311 (7th Cir.) (disqualification), *cert. denied,* 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978). For example, in the context of the attorney-client privilege, "it is the *act* of directly rendering legal advice, services, or assistance that forms the touchstone of the attorney-client relationship." *Brandman v. Cross & Brown Co.,* 125 Misc.2d 185, 479

N.Y.S.2d 435, 437 (Sup.Ct.Kings Co.1984) (emphasis in original).

■ However, there are certain general factors that characterize the existence of an attorney-client relationship. Thus, "[a]n attorney's appearance in a judicial or quasi-judicial proceeding creates a presumption that the attorney-client relationship exists." *Cooke v. Laidlaw, Adams & Peck, Inc.,* 126 A.D.2d 453, 510 N.Y.S.2d 597, 599 (1st Dept.1987). In contrast, the absence of a fee arrangement is a general indication that no attorney-client relationship has been established. *See Elghanayan v. Iannucci,* 145 A.D.2d 345, 535 N.Y.S.2d 611, 612 (1st Dept.1988) ("he was never billed for any advice he may have received; nor did he pay a fee therefor"); *Young v. Oak Crest Park, Inc.,* 75 A.D.2d 956, 428 N.Y.S.2d 69, 71 (3d Dept.1980) ("While it is not essential to the establishment of an attorney-client relationship that the client be billed or that a fee arrangement be made ... [the absence of s]uch facts give[s] rise to a permissible inference that no such relationship existed."). In addition, for the purposes of a legal malpractice action, a constructive agreement or quasi contract of legal representation will not be implied absent proof of unjust enrichment. *See Hashemi, supra,* 609 F.Supp. at 395.

To establish an attorney-client relationship between Heine and Colton Hartnick sufficient to support a legal malpractice action arising out of Ashley's deals, Heine will therefore have to plead facts sufficient to yield an inference that he contacted Colton Hartnick for the purpose of establishing an ongoing relationship concerning advice with respect to the deals, and that a contract of legal representation was agreed to. *Cf. Cohen v. Handelman,* 62 Misc.2d 801, 312 N.Y.S.2d 866, 873 (Civil Ct.N.Y.Co. 1970) (" 'Where it appears that an attorney is consulted to extricate a person from his difficulties, and that the relationship commenced because of the position held by the attorney, and the attorney undertakes to act for the person consulting him, the relationship of attorney and client exists.'" (quoting *Sheehan v. Erbe,* 103 A.D. 7, 9, 92 N.Y.S. 862, 863–64 (1st Dept.1905))).

Examining Heine's Complaint, it is clear that there are insufficient allegations to support an inference that there was an attorney-client relationship between Heine and Colton Hartnick with respect to Ashley's deals.[2] The first contact between Heine and Colton Hartnick related to the Bastis matrimonial proceedings, in 1985. Heine alleges that he was represented during these proceedings by Morrison Cohen, but that he actually looked upon Colton Hartnick as his counsel. Complaint ¶¶ 9 & 10. This allegation, however, does not give rise to an inference that Colton Hartnick represented Heine with respect to Ashley's deals, between 1986 and 1990. Rather, it merely supports an inference that Heine was represented by Ashley and Colton Hartnick during these matrimonial proceedings. *See Ellis, supra,* 397 N.Y.S.2d at 545 ("The fact that an individual has previously been represented by an attorney does not mean that that attorney represents that person for any or all subsequent, unrelated ... matters.").

Heine next alleges that Ashley sought to induce him to invest in a deal in January 1986. In response to this overture, Heine claims that he

> specifically asked Ashley, as a partner in Colton Hartnick, in which Mr. Heine could and did place his trust and confidence, whether the proposed "deal" was legal. Ashley, as a member of Colton Hartnick, in which Heine could and did place his trust and confidence, advised Mr. Heine that the proposed "deal" ... satisfied all legal requirements.

Complaint ¶ 13. As above, these averments fail to give rise to an inference that an attorney-client relationship was formed between Heine and Ashley and/or Colton Hartnick concerning Ashley's deals.

There is no allegation that Heine approached Ashley with the goal of retaining him as a counselor with respect to the deals, and plaintiff does not contend that Ashley or Colton Hartnick agreed to represent him as his attorney with respect to the deals. Heine does not claim that any contractual retainer agreement was executed,

and there is no assertion that Heine paid, or was billed by, Colton Hartnick for any legal services with respect to these investments. In fact, the Complaint reveals that Heine knew how to, and did, execute a retainer agreement with Colton Hartnick for the provision of legal services on two specific occasions. *See* Complaint ¶ 26 ("Heine engaged Colton Hartnick to represent him in the [Cityspire purchase]"); ¶ 34 ("Heine requested Ashley ... to have Colton Hartnick represent Mr. Heine ... [with respect to] certain matters related to Heibara Realty Corporation."). However, there are no similar allegations in support of the claim that Heine retained Ashley and/or Colton Hartnick as his attorneys with respect to Ashley's deals.

Rather, the Complaint only supports an inference that Ashley was acting in his individual capacity when he sought to induce Heine to invest in his schemes. *See, e.g., Sheinkopf v. Stone,* 927 F.2d 1259, 1265 (1st Cir.1991) (rejecting claim that attorney was acting within attorney-client relationship in inducing plaintiff to invest in joint partnership, despite transaction of business on law firm premises). In fact, this conclusion is buttressed by the fact that Heine knew Ashley as a matrimonial attorney, and has not alleged that he sought to retain Ashley for his services as an attorney experienced in investment counseling.

Careful scrutiny of the Complaint further undercuts Heine's claim that he had an ongoing attorney-client relationship with Ashley that included representation with respect to the deals. Plaintiff does not allege that he consulted Ashley for legal advice with respect to the deals throughout the period from 1986 through 1990. Rather, the Complaint repeatedly refers to the single question that Heine allegedly asked Ashley in January 1986 as the basis for the existence of the attorney-client relationship throughout this period. *See* Complaint ¶¶ 13–14 (1986); 16–17 (1986–1987); 22–23 (1987–1988); 30, 32–33 (1989); 36, 38 & 41 (1990). However, Ashley's single statement in January 1986—that the deals were

---

2. The Court addresses Heine's claims arising out of the sale of the condominium below.

legal—cannot serve as the basis for an inference that there was an attorney-client relationship between Colton Hartnick and Heine for the entire period between 1986 and 1990. Thus, to the extent that the first and second causes of action rely on the existence of an attorney-client relationship between Heine and Colton Hartnick with respect to Ashley's deals, these claims must be dismissed.

Nevertheless, "even if ... a formal attorney-client relationship [does] not exist ... an attorney may nonetheless owe a fiduciary duty to persons ... with whom he deals." *Cohen v. Goodfriend*, 665 F.Supp. 152, 158 (E.D.N.Y.1987); *accord Croce v. Kurnit*, 565 F.Supp. 884, 890 (S.D.N.Y. 1982), *aff'd*, 737 F.2d 229 (2d Cir.1984) (fiduciary obligation "arises when a lawyer deals with persons who, although not strictly his clients, he has or should have reason to believe rely on him."); *see also Jacobson v. Sassower*, 122 Misc.2d 863, 474 N.Y.S.2d 167, 168 (App.Term 1st Dept. 1983) ("While the employment of an attorney by a client is largely governed by the contractual provisions of the retainer, elements of trust and confidence endemic in the attorney/client relationship add a dimension to the retainer beyond the terms of the retainer agreement."), *aff'd*, 107 A.D.2d 603, 483 N.Y.S.2d 711 (1st Dept.), *aff'd*, 66 N.Y.2d 991, 499 N.Y.S.2d 381, 489 N.E.2d 1283 (1985); *Bingham v. Sheldon*, 101 A.D. 48, 91 N.Y.S. 917, 920 (2d Dept. 1905) ("He had come into her business affairs as a lawyer and a gentleman; he had come into her confidence because he was a lawyer; ... [and] was subject to the rule that, in transactions between attorney and client, the former is bound to show that his dealings have been fair and just, that his client acted on full information of all of the material circumstances, and that he did not take undue advantage of his client's complacency, confidence, ignorance or misconception.").

■ Even though the facts alleged in the Complaint do not support the inference that there was an attorney-client relationship between Heine and Ashley with respect to the deals, the Court finds that there are sufficient facts to support an inference that Ashley and Colton Hartnick owed a fiduciary duty to Heine. According to the Complaint, Ashley and Colton Hartnick acted as Heine's attorneys before 1986, and Ashley could reasonably have foreseen that Heine would rely on his position as an attorney. Heine also alleges that Ashley was using Colton Hartnick's facilities to perpetrate his schemes, including his office at the firm and partnership letterhead, secretaries and telecopier. Moreover, Heine alleges that partners at Colton Hartnick invested in Ashley's deals, that Colton Hartnick knew or should have known of Ashley's activities and that Colton Hartnick did nothing to prevent the scheme from continuing. *See* Complaint ¶¶ 14, 21, 31, 36 & 37. Although Heine has failed to allege that he had an attorney-client relationship with Colton Hartnick, he has pleaded facts sufficient to support an inference that Colton Hartnick owed him a fiduciary duty, and that this duty was breached.

■ The facts alleged in the Complaint also may serve as the basis for liability with respect to Colton Hartnick based on principles of New York partnership law. Under New York law, "a partnership is only liable for the acts of a partner when those acts were performed in the usual course of the partnership business." *McDonnell v. American Leduc Petroleums, Ltd.*, 456 F.2d 1170, 1187 (2d Cir. 1972). Moreover, a principal will only be bound by the fraudulent acts of its agent if the agent is acting within the scope of his actual or apparent authority. *See Herbert Constr. Co. v. Continental Ins. Co.*, 931 F.2d 989, 993 (2d Cir.1991) (actual authority); *Citibank, N.A. v. Nyland (CF8) Ltd.*, 878 F.2d 620, 623–24 (2d Cir.1989) (apparent authority).

■ In the case at bar, Heine alleges that Ashley used Colton Hartnick's facilities in offering his deals, that Colton Hartnick knew that Ashley was engaging in this course of conduct and that partners at Colton Hartnick also invested with Ashley. It is, of course, possible that discovery will not lead to sufficient facts to allow Heine

to prevail at trial on his claim that Ashley was acting with actual or apparent authority and in the scope of the Colton Hartnick's business in floating his deals. *See Riley v. LaRocque,* 163 Misc. 423, 297 N.Y.S. 756, 764 (Sup.Ct.N.Y.Co.1937) ("The members of a firm of lawyers are not to be treated as partners in trade.... [The agent] had no authority, actual, implied or apparent, to bind the firm."). However, the facts pleaded by Heine can be construed to yield an inference that Colton Hartnick's actions vested Ashley with apparent or actual authority sufficient to impose liability for the deals on Colton Hartnick.

### 2. Applicability of Federal Securities Laws

The Court now turns to consider whether the deals devised by Ashley were "securities," as defined by the federal securities laws. Plaintiff has asserted that these schemes were "securities" under two theories: first, as "investments contracts" under *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), and its progeny; and second, as "notes" under the definition established in *Reves v. Ernst & Young,* 494 U.S. 56, 66–67, 110 S.Ct. 945, 951–52, 108 L.Ed.2d 47 (1990).

Despite differences in the phrasing of the definitions provided in the Securities Acts of 1933 and 1934, "securities" under section 2(1) of the 1933 Act, 15 U.S.C. § 77b(1), and section 3(a)(10) of the 1934 Act, 15 U.S.C. § 78c(a)(10), "are virtually identical and the coverage of the two Acts may be considered the same." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 756 F.2d 230, 238 (2d Cir.1985); *accord Reves, supra,* 494 U.S. at 61 n. 1, 110 S.Ct. at 949 n. 1. The definition of a "security" is broad to provide courts with flexibility "to meet the countless and variable schemes devised by those who seek the use of money of others on the promise of profits." *Howey, supra,* 328 U.S. at 299, 66 S.Ct. at 1103. Therefore, "in searching for the meaning and scope of the word 'security' in the Act[s], form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967).

Nevertheless, it is important to recall that "[t]he fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.'" *Reves, supra,* 494 U.S. at 60, 110 S.Ct. at 949 (quoting *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975)). Thus, the securities laws are not "intend[ed] to provide a broad federal remedy for all fraud." *Marine Bank v. Weaver,* 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982). In fact, the admonition against extending the Securities Acts beyond their intended boundaries is particularly relevant in the instant case.

### a. Were Ashley's schemes "investment contracts"?

■ The definition of "investment contracts" that are drawn within the ambit of the federal securities laws was addressed comprehensively by the Second Circuit in *Gary Plastic, supra,* 756 F.2d at 239–40. The earliest definition of such a "security" was provided in *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), which held that widely distributed assignments of oil leases were "securities."

> [T]he Court focused on whether they were "widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts' or as 'any interest or instrument commonly known as a "security."'" The Court stated that the test is "what character the instrument is given in commerce by the terms of its offer, the plan of distribution, and the economic inducements held out to the prospect."

*Gary Plastic, supra,* 756 F.2d at 239 (quoting *C.M. Joiner Leasing, supra,* 320 U.S. at 351, 64 S.Ct. at 123).

The "investment contract" test was narrowed in *Howey,* where the Supreme Court found that interests in citrus grove acreage were "securities." The test established in

*Howey* found that " '[A]n investment contract ... means a contract, transaction or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits [4] solely from the efforts of the promotor or a third party....' " *Id.* (quoting *Howey, supra,* 328 U.S. at 298–99, 66 S.Ct. at 1102–03). Finally, the Supreme Court added an additional requirement in *Marine Bank, supra,* 455 U.S. at 557–58, 102 S.Ct. at 1224–25. "[F]or an instrument to be a security the investor must risk loss." *Gary Plastic, supra,* 756 F.2d at 239. Thus, in *Marine Bank,* the Supreme Court found that standard certificates of deposit were not "securities" because all risk of loss to the investor is eliminated by FDIC insurance coverage.

Assuming the truth of the allegations in the Complaint, the Court does not believe that Heine has alleged that he invested money in a venture reflecting the "fundamental risk characteristics of the true investment." *Banco Espanol de Credito v. Security Pacific Nat'l Bank,* 763 F.Supp. 36, 44 (S.D.N.Y.1991).[3] In fact, Heine has conceded that there were no businesses underlying Ashley's purported "investment contracts." *See* Complaint ¶¶ 12, 20, 36 & 42. Thus, Heine has failed to satisfy the first *Howey* requirement.

■ Moreover, Heine also has not pleaded facts sufficient to meet the second requirement of the *Howey* test. Although the Second Circuit has not definitively addressed the question, the courts of the Southern District of New York have consistently held that a litigant must establish either horizontal commonality or narrow vertical commonality to demonstrate a "common enterprise" for the purposes of an "investment contract." *See, e.g., Dooner v. NMI Ltd.,* 725 F.Supp. 153, 158 (S.D.N.Y.1989); *Perez–Rubio v. Wyckoff,*

718 F.Supp. 217, 234 (S.D.N.Y.1989). The horizontal commonality theory "require[s] plaintiff to show a pooling of the investors' interests in order to establish a common enterprise." *Kaplan v. Shapiro,* 655 F.Supp. 336, 339–40 (S.D.N.Y.1987); *accord Perez–Rubio, supra,* 718 F.Supp. at 234 ("The funds must actually be pooled."). To establish narrow vertical commonality, the investor must establish that his fortunes are interdependent with the fortunes of the investment manager. *Dooner, supra,* 725 F.Supp. at 158; *Perez–Rubio, supra,* 718 F.Supp. at 234 ("an investor must establish not only that his or her fortunes would rise with the promoter's fortunes, but also that their fortunes would fall together.").

In the case at bar, Heine has failed to plead facts sufficient to meet either of these tests of commonality. Plaintiff has alleged that, between 1986 and 1990, he received a series of postdated checks from Ashley in return for his purported investments. Given the fixed rate of return expected by Heine when the investments were made, it is impossible for the Court to infer that his fortunes would have risen if Ashley's purported businesses proved more successful than otherwise envisioned, or that a minor setback in these purported businesses would have had a proportionate impact on Heine. Vertical commonality therefore is absent.

Similarly, there are no allegations in the Complaint sufficient to support a conclusion of horizontal commonality. Heine has not alleged that there was a group of investors whose funds were collected by Ashley and pooled together for investment in a common enterprise. Plaintiff vaguely refers to investment in "profit making ventures, such as real estate development and sales and fast food operations," Complaint ¶ 11(a), without referring to any specific

---

**3.** Because a rational factfinder could determine that Ashley's deals were a traditional course of common law fraud, the Court refuses to adopt the position that Colton Hartnick cannot be held liable for the deals because they were merely a series of usurious loans. *See Szerdahelyi v. Harris,* 67 N.Y.2d 42, 499 N.Y.S.2d 650, 655–56, 490 N.E.2d 517, 521–22 (1986) ("a usurious transaction is void *ab initio,* and a return of excess interest cannot save to the lender the money actually advanced, or the interest due on the loan."). Moreover, Heine might be able to recover for Colton Hartnick's alleged breach of fiduciary duty in failing to prevent Ashley from using its facilities whether the deals were usurious loans or merely transactions tainted by traditional common law fraud.

businesses in which the funds were invested. *See, e.g., Reves, supra,* 494 U.S. at 58–59, 110 S.Ct. at 947–48 (investment in Oklahoma farmer's cooperative); *Howey, supra,* 328 U.S. at 295, 66 S.Ct. at 1101 (investment in citrus acreage in Lake County, Florida); *Perez–Rubio, supra,* 718 F.Supp. at 234 (investment in Aquarius 100 limited partnership).

Moreover, there has been no showing that funds collected from Heine by Ashley were pooled with other investors' funds. Heine alleges that "partners of Colton Hartnick themselves put their own monies into 'deals' purportedly arranged by Ashley." Complaint ¶¶ 14, 21, 31, 37. However, the allegation that various partners at Colton Hartnick also participated in Ashley's deals does not lead to the inference that the funds were pooled together for investment in a common enterprise. Heine has failed to allege facts sufficient to support an inference that he invested money in a common enterprise, and his claim that Ashley's schemes were an "investment contract" must fail.

Moreover, the Court believes that the deals between Heine and Ashley fail to meet the requirement of an expectation of profits solely from the entrepreneurial efforts of others. As explained in *Banco Espanol, supra,* 763 F.Supp. at 44,

> the plaintiffs had no expectation of capital appreciation from the monies [that were invested]; the rate of return consisted solely of the repayment of the principal plus a fixed rate of interest.... [S]ince the principal and interest owed to the plaintiffs were fixed, the return did not fluctuate depending upon the [entrepreneurial] efforts of [a third party].

In response to the conclusion that the fixed rates of interest involved in Ashley's schemes demonstrate that the deals were not "investment contracts," Heine asserts that many "securities" bearing fixed rates of interest are regulated by the federal securities laws. However, this response misses the point. It is beyond dispute that certain fixed rate "securities," such as bonds and debentures, are specifically drawn within the Securities Acts. *See, e.g.,*

15 U.S.C. §§ 77b(1) & 78c(a)(10). Nevertheless, the inquiry now before the Court focuses on whether Ashley's schemes were "investment contracts" within the meaning of *Howey.* In fact, the Fifth Circuit recently held that a post-dated check scheme almost identical to Ashley's "deals" was not an "investment contract" for the purposes of the federal securities laws. *See Guidry v. Bank of LaPlace,* 954 F.2d 278, 283–284 (5th Cir.1992). Because there has been no showing that Ashley collected capital from Heine for use in a common venture, with investors' rates of return tied to the success or failure of these enterprises, the claim that this scheme was an "investment contract" must fail.

### b. Were Ashley's schemes "notes"?

The Court next turns to consider whether Ashley's schemes were "notes" within the meaning of the federal securities laws. In determining whether postdated checks are "securities," the Court observes that checks, which are drafts, *see* N.Y.U.C.C. § 3–104(2)(b), are excluded from the definition of "security" under the 1934 Act and exempted from the 1933 Act if they have a maturity not exceeding nine months. *See* 15 U.S.C. §§ 77c(a)(3) & 78c(a)(10). However, given that the Court must focus on economic reality rather than on form in determining whether a "note" is a "security," the following inquiry will be guided by the factor analysis established by the Supreme Court in *Reves v. Ernst & Young.*

In *Reves,* the Supreme Court adopted the Second Circuit's "family resemblance" test for determining whether a "note" is a "security." *See Exchange Nat'l Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1137–38 (2d Cir.1976) (Friendly, J.). In adopting this standard, the Supreme Court established a four factor analysis for determining whether a transaction involves a "security." First, the Court must "examine the transaction to assess the motivation that would prompt a reasonable seller and buyer to enter into it." *Reves, supra,* 494 U.S. at 66, 110 S.Ct. at 951. Second, the " 'plan of distribution' " must be analyzed.

*Id.* (quoting *C.M. Joiner Leasing, supra,* 320 U.S. at 353, 64 S.Ct. at 124). Third, "the reasonable expectations of the investing public must be analyzed." *Id.* Fourth, "we examine whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Id.* at 67, 110 S.Ct. at 952.

At the outset of this inquiry, the Court notes that Heine's attempt to fit Ashley's schemes within the Supreme Court's factor analysis demonstrates that the federal securities laws were not meant to apply to a factual scenario like the case at bar. In explaining the first factor, for example, the Supreme Court provided a dichotomy: "if the seller's purpose is to raise money for the general use of a business enterprise," *id.* at 66, 110 S.Ct. at 951, the instrument is a "security"; in contrast, if the "note" is meant to assist in short-term financing or to advance a "commercial or consumer purpose," *id.,* it is not a "security." However, Ashley's schemes were meant to further neither of these goals.

In fact, as alleged by Heine, there were no businesses or investments underlying Ashley's schemes. *See* Complaint ¶¶ 12, 20, 36, 42 ("There were no such 'deals.' "). Ashley's purpose in arranging these transactions was neither "the promotion of commercial enterprises [nor] investments in a business enterprise." *Banco Espanol, supra,* 763 F.Supp. at 43. Moreover, Heine's allegations are inconsistent with a finding that a profit was expected from the investment. The investor's expectation of profits can be satisfied either by "capital appreciation resulting from the development of the initial investment ... or a participation in earnings resulting from the use of investors' funds." *United Housing Foundation, supra,* 421 U.S. at 852, 95 S.Ct. at 2060. In this case, there was no "development" of any "investment," and "investors' " funds were not "used" for any business purpose.

The purported "securities" at issue in this action also fail to satisfy the second and third *Reves* factors. There was no plan of distribution of the purported "notes." *See Singer v. Livoti,* 741 F.Supp. 1040, 1050 (S.D.N.Y.1990); *Guidry v. Bank of LaPlace,* 740 F.Supp. 1208, 1215 (E.D.La.1990), *aff'd,* 954 F.2d 278, 283–284 (1992). Moreover, there clearly was no expectation that these deals would be "traded or speculated in as a security." *Singer, supra,* 741 F.Supp. at 1050. Heine and Ashley personally exchanged checks with one another, and there is no indication that the checks were to be publicly traded or distributed. The deals therefore fail to meet the test of " 'common trading for speculation or investment.' " *Reves, supra,* 494 U.S. at 66, 110 S.Ct. at 952 (quoting *C.M. Joiner Leasing,* 320 U.S. at 351, 64 S.Ct. at 123); *see also Banco Espanol, supra,* 763 F.Supp. at 43 ("There is no indication that the general public was even aware of the existence of this program.").

Finally, the Court turns to the fourth factor, the existence of another mechanism for reducing the risk of the investment. This is not a case where investment risk is reduced by insurance provided by the Federal Deposit Insurance Corporation and regulation by the federal banking laws, *see Marine Bank, supra,* 455 U.S. at 557–58, 102 S.Ct. at 1224–25, or by regulation under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq. See International Bhd. of Teamsters v. Daniel,* 439 U.S. 551, 569–70, 99 S.Ct. 790, 801–02, 58 L.Ed.2d 808 (1979). Nevertheless, the absence of this type of federal regulatory scheme does not lead to the conclusion that Ashley's conduct falls within the ambit of the federal securities laws. *See Guidry, supra,* 740 F.Supp. at 1215 ("Although the fraud perpetrated by [defendant] is not covered by any regulatory scheme, the holder of a worthless check has a right ... to pursue an action against the issuer.").

In responding to the type of fraudulent conduct which allegedly occurred here, the courts and legislature of New York have fashioned broad remedies, including civil suits and criminal penalties. In fact, Ashley has already confessed a $1,539,345 judgment in favor of Heine in this action. Moreover, on September 24, 1991, Ashley

pleaded guilty in the Supreme Court of the State of New York, New York County, to five counts of grand larceny for stealing over $1.28 million through his schemes.

Although these remedies may not have deterred Ashley from perpetrating a course of fraudulent conduct in the first instance, the federal securities laws are not the proper vehicle for regulation of Ashley's schemes. To find that Ashley's deals violated the 1933 and 1934 Acts would be to draw within the scope of the federal securities laws an array of conduct, including a wide range of fraudulent "Ponzi" schemes, which are wholly unrelated to the regulation of capital markets upon which these laws were meant to focus. Although Ashley's allegedly tortious and criminal conduct may have been reprehensible, it was not a violation of the federal securities laws, and Heine's attempts to seek a remedy under these laws must fail. Thus, to the extent that the first and second causes of action rely on the fact that Ashley's deals violated the federal securities laws, these claims must be dismissed.

### C. Causes of Action Relating to Sale of Cityspire Condominium

#### 1. Claims Against Colton Hartnick

■ The Court next turns to consider Colton Hartnick's motion to dismiss the claims asserted in the third and fourth causes of action of the Complaint, arising out of the sale of the Cityspire condominium. Heine's first claim relating to the sale concerns the side agreement between Ashley and Heine, wherein Ashley purportedly became a co-owner of the condominium in exchange for making ongoing payments and furnishing the apartment. Heine raises two basic arguments with respect to the side agreement: that the agreement was void for lack of consideration and that "Colton Hartnick permitted Ashley, a partner in Colton Hartnick, to abuse the attorney-client relationship by inducing Mr. Heine to enter into the side agreement." Complaint ¶ 66(a).

However, these objections suffer from two fundamental defects. First, Heine's claims that the agreement was void for lack of consideration, Complaint ¶ 62, are utterly unsupported by factual allegations. In fact, the Complaint specifically alleges that Ashley assumed responsibility for making ongoing payments and for furnishing the apartment, negating any argument that the contract was void for lack of consideration. See Hamer v. Sidway, 124 N.Y. 538, 545, 27 N.E. 256 (1891) (consideration exists if "something is promised, done, forborne or suffered by the party to whom the promise is made as consideration for the promise made to him"). Second, the Complaint contains no allegation that Colton Hartnick negotiated, knew or should have known about the agreement. In the absence of such allegations, there is no basis for imposing liability on Colton Hartnick with respect to the side agreement.

■ Heine's other claims against Colton Hartnick with respect to the Cityspire condominium allege breach of the firm's duty to provide Heine with adequate legal services and breach of fiduciary duty. As with the claims arising out of Ashley's deals, the Court finds that there are insufficient allegations to support Heine's claim that he had an attorney-client relationship with Colton Hartnick with respect to the sale of the condominium. Although the allegations on this point are confusing, Heine has not asserted that he had a retainer agreement with Colton Hartnick to cover representation during the sale of the condominium. Moreover, Colton Hartnick's representation of Heine at the purchase of the condominium does not give rise to an inference of representation at the sale. See Ellis, supra, 397 N.Y.S.2d at 545 (previous representation does not imply current representation). In fact, Heine specifically concedes, in Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss by defendant [Newman Tannenbaum] ("Plaintiff's Response"), that

although Colton Hartnick had represented Mr. Heine on the *purchase* of the condominium, Ashley, as attorney-in-fact, arranged for Newman Tannenbaum to act as Mr. Heine's attorneys in connection with the *sale* of the condominium, and Newman Tannenbaum did act as Mr.

Heine's attorneys in connection with the sale.

*Id.* at 3–4 (emphasis in original) (citations omitted).

 The Court also finds that there are insufficient facts to support the claim that Colton Hartnick breached its fiduciary duty to Heine with respect to the sale. Although Colton Hartnick allegedly represented Heine at the purchase of the condominium, Heine has not alleged that Colton Hartnick knew that the condominium was being sold or failed to do anything that was required of it to prevent Ashley's alleged malfeasance with respect to the sale. Moreover, Heine does not claim that any of Colton Hartnick's facilities were used to further the sale, or that Colton Hartnick had or should have had any knowledge concerning the disposition of the proceeds from the sale. In the absence of these or similar allegations, there is no basis for an inference that Colton Hartnick breached its fiduciary duty to Heine with respect to the sale of the Cityspire condominium. The third and fourth causes of action therefore must be dismissed.

### 2. Claims against Newman Tannenbaum

Newman Tannenbaum moves to dismiss the claims contained in the fifth cause of action, relating to the sale of the Cityspire condominium, in reliance on three arguments. First, Newman Tannenbaum argues that Heine empowered Ashley to act on his behalf in all matters relating to the sale of the condominium by executing a power of attorney that authorized Ashley "to take all steps and execute any and all documents in connection with the sale of the Cityspire condominium." Complaint ¶ 39. Claiming reasonable reliance on the power of attorney, Newman Tannenbaum asserts that it cannot be held liable for reporting to Ashley rather than to Heine and for allowing the checks for the proceeds from the sale to be made out to Ashley individually. The second argument contends that Heine cannot show that he

would have been injured but for Newman Tannenbaum's allowing four of the checks to be issued to the order of Ashley, because Heine did not even receive the check that was made out to him. Third, Newman Tannenbaum asserts that Heine is precluded from maintaining this suit based on principles of laches, estoppel and ratification.

 Under New York law, the execution of a power of attorney authorizes another party to act in one's place as his attorney-in-fact. *Zaubler v. Picone*, 100 A.D.2d 620, 473 N.Y.S.2d 580, 582 (2d Dept. 1984); *Dick v. Citibank, N.A.*, 145 Misc.2d 563, 548 N.Y.S.2d 133, 134 (Civ.Ct.Kings Co.1989). "An attorney in fact is essentially an alter ego of the principal and is authorized to act with respect to any and all matters on behalf of the principal with the exception of those acts which, by their nature, by public policy, or by contract require personal performance." *Zaubler, supra*, 473 N.Y.S.2d at 582; *accord Dick, supra*, 548 N.Y.S.2d at 134 ("An attorney-in-fact is the alter ego of the principal."). Thus, pursuant to a power of attorney, the attorney-in-fact is empowered to take any and all acts "as fully as the principal might or could do." *Romero v. Sjoberg*, 5 N.Y.2d 518, 186 N.Y.S.2d 246, 249, 158 N.E.2d 828, 830 (1959); *accord Rohrbacher v. BancOhio Nat'l Bank*, 171 A.D.2d 533, 567 N.Y.S.2d 431, 433 (1st Dept.1991) (power of attorney vested attorney-in-fact with power to endorse check, giving bank right to rely on endorsement, even though attorney-in-fact later converted funds).

 A power of attorney "evidence[s] the authority of the agent to third parties with whom the agent deals." *Id.* Moreover, sections 5–1501 through 5–1602 of the New York General Obligations Law specifically authorize the use of a power of attorney and define the scope of the authority it confers. For example, section 5–1502A covers the construction of a power of attorney regarding real estate transactions,[4] and authorizes the attorney in fact

---

**4.** Because the provision for "real estate transactions" was stricken from the statutory power of

attorney form executed by Heine and Ashley, *see* N.Y.G.O.L. § 5–1503, the Court only refers to

"to hire ... any attorney." N.Y.G.O.L. § 5–1502A(11). The attorney-in-fact is also authorized "to receive ... any money ... to which the principal is, or may become ... entitled." N.Y.G.O.L. § 5–1502A(6). General principles of agency law also support the power of an agent to accept payment on behalf of a principal. *See* Restatement (Second) of Agency § 62.

■ Assuming the truth of the facts alleged in the Complaint, it appears that Heine has not stated a valid cause of action against Newman Tannenbaum for legal malpractice. Newman Tannenbaum has demonstrated that it acted in reasonable reliance on the power of attorney in dealing directly with Ashley, and Heine has not contested the conclusion that Ashley was acting as Heine's alter ego. It thus appears to the Court that Newman Tannenbaum had a right to rely on the power of attorney and make payments directly to Ashley, because Ashley had been appointed by Heine as his representative, and was himself bound to turn over the proceeds of the sale to Heine. *See Lalor v. Duff*, 28 A.D.2d 66, 281 N.Y.S.2d 614, 617 (3d Dept. 1967) ("It is presumed that title to a principal's property in the possession of his agent remains in his principal.").[5]

Heine's response to Newman Tannenbaum's claim of reasonable reliance on the power of attorney first asserts that Ashley's instructions to Newman Tannenbaum concerning the payee on the checks derogated from the terms of the contract of sale and from the custom of the trade, which both required that the checks be drawn to the order of Heine personally, or Ashley as attorney-in-fact for Heine. Heine thus argues that it was not reasonable for Newman Tannenbaum to agree to instructions from Ashley that were contrary to the express terms of the contract, and that Newman Tannenbaum assumed a

responsibility to inquire whether departures from the contract were within the scope of Ashley's actual authority.

■ Given that Ashley was serving as Heine's alter ego pursuant to the power of attorney, the Court views Heine's claim that Ashley was not empowered to accept payment under the contract of sale with skepticism. Moreover, Heine's arguments suffer from a more fundamental defect. The contract of sale is not attached to the Complaint, and is not incorporated into the Complaint by reference. Thus, the Court cannot consider the contract of sale on this motion to dismiss. *See Kramer, supra*, 937 F.2d at 773. Similarly, Heine does not allege in the Complaint that Newman Tannenbaum's actions were contrary to customary procedures at real estate closings. Therefore, because "it is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss," *O'Brien, supra*, 719 F.Supp. at 229, the Court may not consider Heine's arguments relating to the proper conduct of a real estate closing.

Plaintiff's Response also contends that there was self-dealing between Ashley and Newman Tannenbaum, and that Newman Tannenbaum breached its duty of loyalty. *See* Plaintiff's Response, at 20–22. Again, however, there are no allegations in the Complaint to support these claims, and they will not be considered on this motion to dismiss. The Court thus finds that the facts alleged in the Complaint do not serve as the basis for a claim against Newman Tannenbaum, and the fifth cause of action therefore must be dismissed.

■ Before concluding, the Court takes this opportunity to reject a number of other arguments raised by Newman Tannenbaum in support of its motion to dismiss. First, the Court rejects Newman Tannenbaum's argument that Heine cannot

---

the powers enumerated in § 5–1502A by analogy. Although not attached to the Complaint, the power of attorney can be considered by the Court because it is incorporated into the Complaint by reference. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir.1991).

**5.** The parties have not briefed, and the Court therefore does not reach, the issue whether an attorney retained by an attorney-in-fact pursuant to a power of attorney represents and must report to the principal, who executed the power of attorney, or the attorney-in-fact, who acted as the principal's alter ego in retaining the attorney.

prove "but-for" causation. *See Sacco v. Burke,* 764 F.Supp. 918, 920–921 (S.D.N.Y. 1991) (but-for causation required as element of legal malpractice action). The fact that Heine never received the check issued to his order at the closing does not support an inference, as a matter of law, that allowing the remaining checks to be issued to Ashley did not injure Heine. The Court also rejects Newman Tannenbaum's characterization of the choice of payees as the "selection of one among several reasonable courses of action" for which a malpractice action will not lie. *Rosner v. Paley,* 65 N.Y.2d 736, 492 N.Y.S.2d 13, 14, 481 N.E.2d 553, 553–54 (1985). *Rosner* concerns an attorney's choice of legal strategy, and is simply inapposite to the case at bar.

Finally, the Court rejects Newman Tannenbaum's claim that Heine is barred from bringing the instant suit by laches, estoppel or ratification. Newman Tannenbaum has not raised any claim that it was prejudiced by Heine's alleged delay, thus precluding reliance on the defenses of laches and estoppel. *See, e.g., Hoelzer v. City of Stamford,* 933 F.2d 1131, 1137 (2d Cir. 1991) (showing of prejudice required to support laches defense). Moreover, Heine has not taken any affirmative action that might support an inference that he ratified Ashley's instructions concerning the issuance of the checks. *See, e.g., Ambrose Mar–Elia Co. v. Dinstein,* 151 A.D.2d 416, 543 N.Y.S.2d 658, 660 (1st Dept.), *appeal denied,* 74 N.Y.2d 615, 549 N.Y.S.2d 960, 549 N.E.2d 151 (1989). The defenses of laches, estoppel and ratification therefore must be rejected.

D. *Leave to Replead*

Under Fed.R.Civ.P. 15(a), leave to amend a Complaint "shall be freely given when justice so requires." Rule 15(a) has been interpreted liberally, and the granting of a motion to dismiss is almost always accompanied by leave to replead. *See Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198 (2d Cir. 1990); *Richardson Greenshields Sec., Inc. v. Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987); *Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.

1986). The Court therefore grants Heine leave to amend his Complaint.

## CONCLUSION

For the foregoing reasons, the motions to dismiss are granted in part, denied in part. The first two causes of action are dismissed to the extent that they rely on the contentions that Heine had an attorney-client relationship with Colton Hartnick with respect to Ashley's deals, and that these deals were within the scope of the federal securities laws. The third, fourth and fifth causes of action hereby are dismissed. Heine is hereby granted leave to serve and file an amended Complaint within 21 days.

SO ORDERED.