Burton B. Roberts, J.
The defendant Marvin Ellis, indicted by the Grand Jury of New York County for murder in the second degree, moves to suppress a series of three statements. Additionally, the defendant moves to suppress certain physical evidence, a pair of shoes and a shirt, which was removed from his room.
The relevant issues here are whether the defendant had an attorney at the various times that he made admissions; whether he was "in custody” during the times that the admissions were made and the "consent” to search was signed; and, with respect to the defendant’s final admissions, were they "spontaneous.”
Following the hearing, the court has determined the following findings of fact and conclusions of law.
Shortly after 9:00 a.m. on April 21, 1976, detectives from the 4th homicide zone were summoned to the Endicott Hotel at 440 Columbus Avenue. A report was given over the telephone that there was a dead woman in a communal bathroom on the first floor of the hotel.
Detective Sergeant Thomas Makon, Detective Michael Val-lone and other detectives of the 4th homicide zone responded to the hotel and were directed to a communal bathroom, where they saw a woman sitting on a commode. Her dress was rolled up around her waist. She was badly bruised. Blood was visible around her nose, mouth and genital area. She was dead.
The dead woman was identified by someone in the hotel as "Candy”, last name unknown. An assistant medical examiner was summoned to the hotel shortly after the detectives arrived. He examined the dead woman’s body, but he stated that *30 he could not determine the cause of death until he performed an autopsy. Thus, the death at that time was considered a "suspicious death,” — it was not then listed as a homicide.
Endeavoring to find out some information about the dead woman, the police spoke to the room clerk. He told them that the woman had on previous occasions visited room 141. The defendant, Marvin Ellis, was listed as the occupant of room 141. Then, going back to the bathroom where Candy had been found, the police followed a trail of blood leading to — room 141 — the defendant’s room. The room clerk was summoned by Detective Vallone and he opened the door to Ellis’s room. Detective Vallone did not enter the small room, but he noted that it was unoccupied and that there was a small broken table in the room. Vallone told the room clerk to lock Ellis’s room. Then, before he left the hotel, Vallone gave the room clerk a printed card, containing his name, command and phone number. He told the clerk to give the card to Marvin Ellis when he next saw him and ask Ellis to contact him. The detective then left the hotel.
The following day, Ellis returned to the hotel, where he was told of Miss Rodriguez’s death. One of the room clerks gave Ellis Vallone’s "calling card.” Ellis, a veteran of numerous criminal convictions, called an attorney, Mr. Mason, who was then representing him on an unrelated drug charge. Some time in the morning, Ellis spoke to the attorney and told him that he was going over to the 20th Precinct to discuss the death of a girl he knew. Ellis finished the conversation believing that he would meet the attorney at the 20th Precinct at 11:00 o’clock that morning, April 22, 1976. (Mason’s perception of that conversation is somewhat different. He, too, insists that he spoke with the defendant that morning, but he claims that he did not arrange to meet Ellis at the precinct at 11:00 o’clock, but, instead, told Ellis that he would meet him at the precinct after he finished his business in court.)
Prior to his conversation with his attorney, Ellis called the 20th Precinct, at 8:30 a.m. and left word that he would be coming over. Then, when Detective Vallone arrived at the station house around 9:30 a.m., he received the following message, "Marvin Ellis is coming in to see you this morning, with his attorney”.
Later, at 11:00 a.m., Detective Vallone saw a man standing at the third floor entrance to the detective squad. He had two cards in his hand. One was Detective Vallone’s and the other *31 was Mason’s card. Detective Vallone asked if he could help the man. The man answered that he was Marvin Ellis and said that he was supposed to meet Detective Vallone and Mr. Mason (whose card he showed to Detective Vallone) at the squadroom.
Vallone identified himself and told Ellis that his lawyer had not appeared at the office.
Ellis then told Vallone that he had heard,- at the hotel, that a girl had been stabbed, and that the police had looked for him in connection with the stabbing.
Vallone told Ellis not to worry, because the dead woman had not been stabbed. Vallone asked Ellis if he had known the young woman. Ellis replied that he was not sure. He said that he knew many women.
Vallone described the woman and showed Ellis a photograph that had been taken of the deceased in the bathroom of the Endicott Hotel.
Ellis immediately stated that he knew her and that her name was Candy Rodriguez.
Vallone then removed a printed card from his wallet and read the now familiar preinterrogation warnings.
Specifically Vallone told Ellis that he had a right to remain silent and refuse to answer questions. Ellis stated that he understood.
Vallone told Ellis that anything he said might be used against him in a court of law. Ellis stated that he understood.
Vallone told Ellis that he had a right to consult an attorney before speaking to the police and to have an attorney present during the questioning. Ellis stated that he understood.
Vallone told Ellis that if he could not afford an attorney, one would be provided free of charge. Ellis stated that he understood.
Further, Detective Vallone told Ellis that if he did not have an attorney available, he had the right to remain silent until he had an opportunity to consult one. Ellis stated that he understood.
Finally, Vallone asked Ellis if he wished to answer questions and Ellis replied that he wanted to get the matter cleared up. He was relieved to find that the girl was not stabbed, as he thought, and he wanted to explain and "straighten” the matter out.
*32 At that point, Vallone and his superior, Sergeant Makon, who was also present, decided to take a handwritten statement from Ellis. Due to a break in a major homicide investigation, Vallone and Sergeant Makon were unable to find a room in the 20th Precinct where they could question Ellis in private. They, therefore, decided to drive to the nearby 24th Precinct. They asked Ellis if he would go to the 24th Precinct to discuss the matter and he readily agreed. Before leaving, however, both Vallone and Makon informed the receptionist in the detective squadroom and the switchboard operator downstairs that they were going to the 24th Precinct and that Mason was to be so informed if he called the 20th Precinct.
Vallone, Makon, and Ellis, who was not under physical restraint — not handcuffed — then left the 20th Precinct and drove in a car to the nearby 24th Precinct. Vallone called the 20th Precinct and gave them the number where he, and Ellis, could be reached by telephone if Mason called. Up to that time Mason had not called the police, nor had the police called Mason.
At the 24th Precinct Ellis and the officers sat down on chairs around a desk and Vallone again read the same warnings to Ellis that he had read previously at the 20th Precinct. Ellis again stated that he understood his rights and that he wished to answer questions concerning the deceased.
In response to the question of "what happened?” Ellis gave a virtually unbroken narrative. He told Vallone and Makon that "Candy” had been staying with him for three days when, late on the evening of April 20, 1976, he came home and discovered her lying on the floor of room 141.
Ellis thought that Candy, a drug user, was suffering from an overdose of drugs. Ellis, high on drugs himself, tried to revive her by walking her around the room, pounding her on the back and chest with his fist and pinching her. During the vigorous resuscitation attempt, Ellis and the girl tripped over the table, crashed against a wall and fell to the floor. "Candy” was never more than half-conscious during these proceedings, moaning occasionally. After several hours, Ellis realized that he was not going to be able to revive her; he panicked and half walked and half dragged Candy to a bathroom 100 feet away and placed her on a commode, where her body was later discovered.
After reciting the story to the officers, Vallone wrote down *33 the substance of Ellis’s statement. This was read to the defendant and he signed each of the four page statement.
After Ellis signed the statement, Sergeant Makon left the room and called the Medical Examiner’s Office. He spoke to Dr. Perl, who had just finished the autopsy of Candy Rodriguez. Makon told Dr. Perl the substance of Ellis’s statements. Dr. Perl replied that Ellis’s story was inconsistent with the autopsy results and that the death was homicidal. He indicated she had severe internal injuries, and several broken bones.
While Makon was speaking to the medical examiner, Val-lone asked Ellis if the clothes that he had worn the previous night were in his room. Ellis said they were. Vallone then told Ellis that his room could not be searched unless he agreed to it. Ellis thereupon agreed to allow the police to go to his room and signed a "consent” form allowing officers to enter his room to remove any "effects” belonging to Candace Rodriguez as well as Ellis’s shirt and shoes.
Makon returned to the room and told Vallone of the medical examiner’s report.
Shortly after noon the three men left the 24th Precinct and drove to the Endicott Hotel where they accompanied Ellis to his room. They all went to the room and Ellis gave the officers a shirt and a pair of shoes.
The officers and Ellis then returned to the 20th Precinct at 1:00 p.m., two hours after Ellis’s initial appearance at the precinct. There, Detective Vallone telephoned the New York County District Attorney’s Office and spoke to an Assistant District Attorney. Vallone informed the prosecutor of the events since the discovery of Miss Rodriguez’s body.
The prosecutor immediately told Vallone to call Ellis’s attorney. Vallone called Mason’s office and spoke to a secretary, informing her that Ellis was at the precinct, waiting for him. She knew nothing about Ellis and stated that the attorney was probably in court, somewhere.
Some 90 minutes later, the prosecutor who had not yet arrived at the 20th Precinct, called Detective Vallone. He told Vallone to again try to contact Ellis’s attorney.
Once again Detective Vallone placed an unsuccessful call to the attorney’s office. Once again Vallone spoke to the secretary. Vallone told her that Marvin Ellis was still waiting for *34 his attorney and that he was being arrested for homicide. The secretary still did not know where Mason was.
A short time later, around 3:00 p.m. the prosecutor, accompanied by a stenographer, arrived at the station house.
By this time a room was available at the precinct and the prosecutor, the stenographer, Vallone and Ellis went there.
Once again Ellis was given the preinterrogation warnings and again he indicated that he was aware of his rights and that he wished to discuss his knowledge of Candy’s death. Ellis then repeated, in substance, his prior statement to Vallone. This statement was recorded by the stenographer.
Almost two hours later, around 5:30 p.m., Ellis’s attorney finally called the 20th Precinct. He spoke to Detective Vallone who told him that Ellis had made a statement and was being arrested for murder. The attorney asked Vallone when Ellis would be arraigned and was told that the arraignment would take place, the following morning. The attorney did not ask to speak to Ellis nor did he ask the police not to question Ellis any further. In any event, no further interrogation of Ellis took place.
The following morning Detective Vallone picked up Ellis from the Tombs where he had been taken before arraignment. Vallone walked Ellis to the holding pens adjacent to the arraignment part in Criminal Court. In response to Vallone’s salutation of "Hello, how are you?”, Ellis replied, "I shouldn’t have gotten involved with that bitch. Should have gotten her an ambulance. And * * * should never have come up to see [Vallone] ***[!] should have run.”
When Ellis was arraigned, his "attorney” had not appeared, nor indeed, did he ever appear in this case.
At arraignment, Ellis complained that he was sick, suffering from withdrawal symptoms. This was Ellis’s first complaint of illness. He did not complain of or exhibit any illness or discomfort prior to that time.
The initial issue confronting this court is whether there was an attorney-client relationship between Ellis and his attorney. Then, if there was such a relationship, when did it begin? At the time that Ellis learned that the police wished to question him, he was represented by Mr. Mason on an unrelated drug case. The fact that an individual has previously been represented by an attorney does not mean that that attorney represents that person for any or all subsequent, unrelated *35 criminal matters (People v Hetherington, 27 NY2d 242, 245; People v Taylor, 27 NY2d 327, 331-332). Here, however, Ellis was not relying merely on Mason’s prior legal representation. He had called and spoken to Mason, who, at the very least, left Ellis with the impression that they would meet at the 20th Precinct. It is common knowledge that most individuals do not have attorneys under formal retainer for criminal matters. The initial arrangements for representation are often informal. Thus, it is necessary to look at the words and actions of the parties. In determining whether a lawyer has entered the proceedings "mechanical” and "arbitrary” requirements should be avoided (People v Gunner, 15 NY2d 226, 231-232; People v Arthur, 22 NY2d 325, 328-329). Although in the cases cited above, the attorneys themselves did some affirmative act to make their presence known, Ellis was just as affirmative in declaring that he had an attorney. Indeed, he gave the attorney’s name and telephone number to Detective Vallone. It would be a harsh rule, indeed, that would determine the existence of an attorney-client privilege solely upon the exertions of the attorney. Certainly, there is little to commend in the attorney’s actions here on behalf of his client. He never called the precinct until some eight hours after the defendant had called him. But Ellis still believed — in light of his conversation with Mason — that Mason was going to represent him in connection with the homicide investigation. Certainly, Mason eventually indicated to Vallone that he was going to represent Ellis at the arraignment. Thus, on all of the evidence adduced at the hearing, the court concludes that Ellis was represented by counsel, Mr. Mason, and this fact was known by the police from the time that Ellis first arrived at the station house on April 22nd.
The next issue is whether the police could question Ellis in the absence of his attorney. Once an attorney has entered the proceeding, the police may not question a defendant in custody in the absence of counsel unless there is an affirmative waiver in the presence of the attorney, of the defendant’s right to counsel (People v Arthur, supra, p 329; People v Hobson, 39 NY2d 479). However, the rule of the Arthur case does not apply to noncustodial interrogation (People v McKie, 25 NY2d 19, 28).
A person is in custody, and therefore his interrogation is custodial when he is "taken into custody or otherwise deprived of his freedom of action in any significant way” (Mi *36 randa v Arizona, 384 US 436, 444; Oregon v Mathiason, 20 Crl 4137; 429 US 492).
The standard for determining custody was set forth in People v Yukl (25 NY2d 585, 589) where the Court of Appeals held, "The test is not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought had he been in the defendant’s position.”
Thus, we look to the facts. Recounted in greater detail above, the facts show that the defendant voluntarily came down to the station house at an early stage of the investigation — when it was by no means certain that the death was homicidal. He was not physically restrained. He was quite eager to tell his story, wholly exculpatory, to the detectives. He told his story in narrative form to the detectives as soon as they found a room in the 24th Precinct. Ellis knew that the officers left word for his attorney that they were going to the 24th Precinct.
Initially, the fact that an interrogation takes place in a station house does not mean that the interrogation is custodial (Oregon v Mathiason, supra, p 495; People v Yukl, supra, p 589).
Indeed, in Yukl the defendant was questioned for nine hours, the last five in a police station until 6:30 a.m. and the questioning was not held to be custodial. This was largely because the thrust of the police work in Yukl, as here, was investigatory and not accusatory. Indeed, in Mathiason, the police asked Mathiason, a parolee, their only suspect in á burglary case, to come down to the police station. Mathiason agreed to come down and was questioned in a room with a police officer and a tape recorder. He was told that he was not under arrest, but that his fingerprints had been found at the scene. He did not receive Miranda warnings. Mathiason, after a few minutes, admitted his guilt. The Supreme Court held that this was not custodial interrogation in the absence of any formal arrest or restraint on freedom of movement simply because the questioning took place in a police station. The court noted that any police interrogation has some coercive aspects to it, since the police are connected to a system that may cause a witness to be charged with a crime. But they concluded in Mathiason, as this court does here, that the interrogation did not involve those restraints on personal freedom such as to place a witness in custody within Miranda. Here, in an excess of caution not to be discouraged, Detective
*37 Válleme fully informed Ellis of his rights. Far from increasing any custodial atmosphere, the effect of these warnings is to prevent an unwary witness from incriminating himself. While these warnings are not required in noncustodial settings, they only inure to the benefit of the witness. They do not convert otherwise noncustodial interrogation into custodial interrogation (cf. Oregon v Mathiason, supra, p 495).
Indeed, one of the determinative factors here is that the focus on the police work was investigatory, not accusatory (Escobedo v Illinois, 378 US 478). Indeed if mere questioning of suspects, let alone potential witnesses, by police in precincts, in the absence of their counsel, violated the right to counsel, an intolerable burden would be placed upon law enforcement.
Lastly, this defendant is ring-wise, having had numerous brushes with the law, by his admission over 40 arrests and numerous convictions. He voluntarily came to the police with a story he was all too willing to tell. As former Chief Judge Lumbard has noted: "The very same naive optimism which spurs the criminal on to complete his illegal act in the belief that it will not be detected often leads him to feel that in a face-to-face encounter with the authorities he will be able to beguile them into exculpating him.” (United States v Vita, 294 F2d 524, 529.) Having voluntarily come to the police to tell them his exculpatory story, Ellis cannot now be heard to complain that his interrogation was so coercive as to be custodial. Indeed, Ellis’s eager response to the preinterrogation warning reinforces this conclusion.
On all of the evidence, this court concludes beyond a reasonable doubt that Ellis was not in custody at the time that he was questioned at the 24th Precinct, and voluntarily gave his statement. Therefore, his statement made there, in the absence of his attorney is.admissible and his motion to suppress this statment is denied (People v McKie, 25 NY2d 19, 28 supra).
However, almost immediately after Ellis’s statement had been taken and reduced to writing, Sergeant Makon spoke to the medical examiner. As a result of that conversation he knew that a homicide had been committed, and, with Ellis’s statement he had probable cause to arrest Ellis for murder. Indeed, so sure were the police that they "had their man,” that they called an Assistant District Attorney to take a statement from the suspect.
*38 Thus, from that time on the investigation, no matter how subtly or artfully conducted, was primarily accusatory. Ellis was now in custody.
Therefore, as a defendant in custody, Ellis was from that time entitled to, and indeed could not waive, the presence of his attorney. As the case switched to the accusatory role, the Arthur rule now governed the case. (See People v Hobson, 39 NY2d 479, 483, supra.)
Moreover, there was no need for the attorney or the defendant to request the police to respect the defendant’s right for an attorney, once he was in custody (People v Arthur, 22 NY2d 325, 329, supra).
Thus, the "consent to search,” signed in the absence of counsel and the room search, and the statements given to the prosecutor in the absence of counsel are not admissible. Measured by Federal standards a defendant in custody represented by counsel can, as he did in this case, waive the presence of counsel provided no trickery is used to accomplish a waiver. In this case the attorney’s office was called twice in effort to have him come to the precinct and represent his client prior to interrogation. There was nothing more they could have done.
But the actions of law enforcement in this State must comply with the more stringent standard as People v Arthur (supra) and reaffirmed in People v Hobson (supra). I am obliged to follow these precedents. (See Hobson, supra, pp 487-489.)
Finally, the defendant moves to suppress his unsolicited statements made to Detective Vallone while being brought to the holding pens before arraignment. They were not given in response to any questions, nor were they the product of coercion or trickery. Most probably, they were the only unplanned statements Ellis gave.
In any event, the court finds beyond a reasonable doubt that the defendant’s statements were spontaneously volunteered. Such statements are not protected by the Arthur rule. (People v Kaye, 25 NY2d 139, 144; People v Hobson, supra, p 483.)
Indeed, it would be illogical to exclude such statements since they are not the subject of objectionable police behavior, and would reward the guileful, boastful, brazen defendant without corresponding benefit to the search for truth or due process of law.
*39 The defendant’s motion to suppress the statement made to Detective Vallone just prior to his arraignment is therefore denied.