**Pasquale CATIZONE, Plaintiff,**

v.

**Gary B. WOLFF, Defendant.**

**No. 96 Civ. 0074(MGC).**

United States District Court,
S.D. New York.

Nov. 10, 1999.

Olshan Grundman Frome Rosenzweig & Wolosky LLP, New York City, by Peter S. Cohen, Thomas J. Fleming, for plaintiff.

Langer & Charles, New York City, by Alfred W. Charles, for defendant.

## OPINION

CEDARBAUM, District Judge.

Pasquale Catizone sues Gary Wolff for legal malpractice, fraud, breach of fiduciary duty and constructive trust in connection with two corporate transactions in which Catizone contends Wolff acted as his lawyer. Wolff denies that he represented Catizone personally in the transactions, and counterclaims for extortion and conversion. Plaintiff is a resident of New Jersey and defendant is a resident of New York. Catizone seeks damages in excess of $75,000.

At the three-day bench trial, two witnesses testified: Catizone and Wolff. After examining all the evidence, observing the demeanor of the witnesses, and considering the plausibility and credibility of the testimony, I conclude that Catizone has failed to meet his burden of proving his claims against Wolff by a preponderance of the credible evidence, and that Wolff has failed to prove his counterclaims against Catizone by a preponderance of the credible evidence.

## BACKGROUND

Catizone and Wolff have known each other professionally since at least 1982. During the course of this professional relationship, Wolff performed legal services for corporations in which Catizone was the principal shareholder. He also represented Catizone personally in a few matters. This case concerns the legal services provided by Wolff in connection with two corporate deals that Catizone entered into and completed in 1994.

The first transaction was Catizone's sale of a controlling stock interest in CGS Units, Inc. ("CGS"), a publicly-held shell company, to Pioneer International, Ltd. ("Pioneer"), a company represented by a businessman named John Figliolini ("Figliolini"). Catizone retained a minority interest in CGS. According to Catizone, he and Figliolini agreed that in conjunction with Catizone's sale of the CGS shares to

Pioneer, CGS would acquire Direct Marketing Services, Inc. ("DMS"), in a stock-for-stock deal under which the then-current shareholders of CGS would retain a 5% total stock interest in CGS. Catizone insisted that the pre-acquisition shareholders of CGS retain a 5% stock interest in the post-acquisition company. The agreement between Catizone and Figliolini for the 5% CGS deal was never reduced to writing.

The second transaction was Catizone's sale of a portion of his shares in Taris Inc., another publicly-held shell company, to an individual named Werner Heim. According to Catizone, he and Heim agreed that in conjunction with the stock sale, Taris would acquire one of Heim's other companies in a stock-for-stock acquisition under which the pre-acquisition shareholders in Taris would retain a 5% total stock interest in Taris. Catizone testified that he entered into the Taris deal because he had Heim's agreement that the pre-acquisition shareholders would retain a 5% interest in the post-acquisition company. The agreement with Heim was not reduced to writing.

Catizone testified that he was personally represented by Wolff in undertaking to sell CGS stock to Figliolini's company and to sell Taris stock to Heim.

Catizone complains that Wolff's legal services were inadequate in a variety of ways. His main complaints are that Wolff did not put his agreements with Figliolini and Heim into writing, and that, in advance of the acquisitions, Wolff advised Catizone to resign as director and officer of CGS and Taris and to sign agreements to vote his CGS and Taris shares to approve the acquisitions, thus depriving Catizone of the means to object to subsequent changes in the terms of the acquisitions. Catizone complains that after he followed Wolff's advice—by resigning and agreeing to vote his shares to approve the acquisitions—CGS and Taris issued pre-acquisition shares to Wolff. This issuance of shares to Wolff reduced Catizone's share of the 5% stock interest that the pre-acquisition shareholders were supposed to retain. Because Wolff's shares constituted part of the 5% pie to be divided among the pre-merger shareholders, Catizone argues that Wolff's receipt of the shares benefitted Wolff at Catizone's expense, and was a breach of Wolff's fiduciary duty to Catizone. He also argues that Wolff's failure to disclose his intention to acquire the stock interest in the companies was fraudulent.

Wolff had asked to buy shares in CGS on a prior occasion, and Catizone had refused Wolff's request.

Wolff testified that he did not represent Catizone in the 1994 CGS and Taris matters, but rather, after Catizone sold controlling interests in CGS and Taris, Wolff became corporate counsel to CGS and Taris. Wolff testified that, as counsel for CGS and Taris, he performed some due diligence and drafted the acquisition agreements, notices of special meetings of shareholders for approval of the acquisitions, proxy statements, board minutes, and related documents.

According to Wolff's uncontroverted testimony, because both CGS and Taris lacked cash, the corporations paid him for his legal services with newly issued pre-acquisition CGS and Taris shares.[1] Thus, issuing stock to Wolff was in lieu of cash compensation for his legal work in connection with the acquisitions. Wolff was never an officer or director of CGS or Taris. Figliolini, as the sole director of CGS, authorized the issuance of CGS stock to Wolff. (Pl.Ex.71.) Heim, as president of Taris, authorized or ratified the issuance of Taris stock to Wolff. (Def.Ex.20.)

---

1. The names of CGS and Taris were changed after the transfer of control from Catizone to Pioneer and Heim. For clarity, this opinion consistently refers to the companies as CGS and Taris.

## DISCUSSION

### A. Was Wolff Catizone's Lawyer?

■ An action for malpractice is generally available only to the party who retained the services of the lawyer being sued. *Haight v. Grund,* 87 Civ. 8857, 1990 WL 63795, at *2 (S.D.N.Y. May 10, 1990); *Crossland Sav. FSB v. Rockwood Ins. Co.,* 700 F.Supp. 1274, 1280–81 (S.D.N.Y.1988); *Cohen v. Goodfriend,* 665 F.Supp. 152, 158 (E.D.N.Y.1987); *Grenoble Mills, Inc. v. Drinker, Biddle & Reath,* 84 Civ. 3514, 1986 WL 8697, at *2 (S.D.N.Y. July 30, 1986). In this case, Catizone had the burden of proving by a preponderance of the credible evidence that he had retained Wolff to act as his lawyer in connection with the CGS and Taris deals.

■ "Under New York law, 'the relationship of an attorney and client is contractual, and the rules governing contract formation determine whether such a relationship has been created.'" *Heine v. Colton, Hartnick, Yamin & Sheresky,* 786 F.Supp. 360, 365–66 (S.D.N.Y.1992) (quoting *Hashemi v. Shack,* 609 F.Supp. 391, 393 (S.D.N.Y.1984)). "Thus, 'an attorney-client relationship arises only when one contacts an attorney in his capacity as such for the purpose of obtaining legal advice or services.'" *Id.* at 366 (quoting *Priest v. Hennessy,* 51 N.Y.2d 62, 68–69, 431 N.Y.S.2d 511, 409 N.E.2d 983 (1980)). However, formality is not an essential element in the employment of an attorney, and since the initial arrangements for representation are often informal, it is necessary to look at the words and conduct of the parties. *Id.*

■ As set out in *First Hawaiian Bank v. Russell & Volkening, Inc.,* 861 F.Supp. 233, 238 (S.D.N.Y.1994), the factors that many courts have considered in determining the existence of an attorney-client relationship include: "1) whether a fee arrangement was entered into or a fee paid; 2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; 3) whether there was an informal relationship whereby the attorney performed legal services gratuitously; 4) whether the attorney actually represented the individual in an aspect of the matter (e.g., at a deposition); 5) whether the attorney excluded the individual from some aspect of a litigation in order to protect another (or a) client's interest; 6) whether the purported client believed that the attorney was representing him and whether this belief was reasonable." (internal citations omitted).

■ *1. No fee arrangement or fee paid.* There is no evidence that Catizone paid Wolff for legal services after 1989. When asked at trial if he had paid Wolff from his own account in recent years, Catizone replied that he would have to consult his checkbook. Since this litigation has been pending for three years, and Catizone is a sophisticated party, his failure to produce copies of any such checks supports an inference that Catizone made no personal payment to Wolff from 1990 through 1994. Nor is there any other evidence to suggest the existence of a fee arrangement between Catizone and Wolff for legal work done in 1994.

*2. No written contract or retainer agreement indicating that Wolff accepted representation.* It is undisputed that the parties did not have a written retainer agreement.

*3. Insufficient proof of an informal relationship whereby the attorney performed legal services gratuitously.* According to Wolff, he always billed Catizone for personal legal services. Catizone testified that Wolff only "sometimes" billed him, and at other times, either billed the corporation to which the personal services related, or performed the services without charge. Catizone's testimony was not credible in this regard. His demeanor and defensiveness on cross-examination and his lack of forthrightness on this and other subjects made him less credible overall than Wolff.

Checks offered as evidence by Wolff show that Catizone paid Wolff with personal checks on eight occasions between September 14, 1983 and October 18, 1989. (Def.Ex.4A.) Five of the checks are for amounts between $2000 and $5000, and three are for amounts between $175 and $500. Some of the checks bear the memo, "Legal."

Wolff offered as evidence copies of two bills that he sent to Catizone for professional services rendered to Catizone personally in October 1989. (Def.Exs.3, 3A.)

Based on Catizone's personal checks to Wolff, the two bills that Wolff sent to Catizone, Wolff's testimony that he always billed Catizone individually for personal legal work and did not render his services gratuitously, and Catizone's lack of credibility, I find that when Wolff represented Catizone personally, he billed Catizone personally.

*4. No actual representation of Catizone by Wolff.* Wolff credibly testified that the last time he represented Catizone personally and was paid for the representation was in 1989, four years before the transactions at issue. This testimony is consistent with the evidence that the most recent of Catizone's personal checks to Wolff is dated October 1989.

Catizone testified that, after January 1, 1990, in addition to representing him in the CGS and Taris transactions at issue in this case, Wolff represented him personally by defending his deposition in the L'Anza litigation and by helping Catizone recoup a $100 overpayment to a company called Lightsavers, Inc.

It is undisputed that Catizone was deposed in the L'Anza case and that Wolff defended the deposition. However, Wolff testified that he attended the deposition not to represent Catizone's interests, but rather, to protect the interests of his client, J & E, which was named as a defendant. Catizone was not named as a defendant in that suit. Wolff was paid by J & E. No other attorney appeared at the

deposition on behalf of J & E. I credit Wolff's testimony that he attended Catizone's deposition as counsel to defendant J & E.

With respect to the Lightsavers matter, Catizone failed to present credible evidence that Wolff participated in the matter as Catizone's attorney rather than as attorney for Lightsavers or its principals.

The critical issue is whether Wolff represented Catizone personally in any part of the CGS and Taris transactions, both of which occurred in 1994. According to Catizone, Wolff arranged for and attended the negotiation sessions for each of these transactions, allegedly as Catizone's attorney.

It is undisputed that Wolff introduced Catizone to Figliolini and Heim by giving him their telephone numbers. Wolff gave Catizone the telephone numbers when Catizone asked him for names of persons who might be interested in acquiring one of Catizone's publicly-held shell corporations. Since he had performed legal work for Figliolini and Heim, Wolff knew of their potential interest in Catizone's shell corporations. Catizone then called Figliolini and Heim on his own.

According to Catizone's version of events, a few days after he called Figliolini, on or about January 4, 1994, he met with Figliolini in Wolff's office and negotiated all the terms for the CGS transaction with him while sitting at Wolff's desk across from Wolff. Wolff flatly denied that a CGS meeting between Figliolini and Catizone had ever taken place in his presence or in his office. He testified that he learned about Figliolini and Catizone's oral agreement only after the fact, when Figliolini, as CGS's proposed new president, requested that Wolff represent CGS in the acquisition.

Buttressing Wolff's testimony is a letter written by Figliolini to Wolff setting out Figliolini's detailed notes of a January 26, 1994 meeting with Catizone regarding the CGS transaction. (Pl.Ex. 55.) Had the

meeting taken place at Wolff's desk in Wolff's presence, there would have been little need for Figliolini to send a letter to Wolff summarizing the terms of the agreement.

Also supporting an inference that Catizone negotiated the deal with Figliolini on his own without Wolff's presence or assistance is Catizone's testimony that, during the relevant time period, he drove to Figliolini's office in New Jersey once or twice to meet with Figliolini by himself because he wanted to do more deals with Figliolini. Catizone's testimony that he did not engage in negotiations about CGS on these visits was not credible.

Catizone testified that at the Drake Hotel he met with Heim once and with his business partner Roland Kaufman twice to discuss the terms of the Taris deal. At one of these meetings, according to Catizone, Wolff was present and all the terms of the Taris deal were agreed to.

Wolff denied being present at the Taris negotiation. Wolff admitted that he went to the Drake during the relevant time frame to meet with Heim and Kaufman, shortly before attending Figliolini's wedding on that day. According to Wolff, on that occasion, upon entering Heim's suite of rooms, he found Heim and Kaufman (whose wives were also present) in conversation with Catizone. It is undisputed that Wolff and Catizone did not expect to see each other at the Drake Hotel and that Catizone had not invited Wolff to attend. Wolff testified that within minutes of Wolff's arrival at the Drake, without any group discussion of the Taris deal, Catizone shook hands and departed. According to Catizone's version of the event, however, Wolff was present during a significant portion of the negotiation, which started about fifteen minutes before Wolff arrived.

Catizone's testimony, unsupported by any other evidence and squarely contradicted by Wolff's more credible testimony, fails to establish that it is more likely than not that Wolff was present during the negotiations for the CGS and Taris deals.

The credible evidence shows that Wolff was not present during the negotiations for either the CGS or Taris deals. Nor was he informed about the negotiations until after they had been completed. Even then, it was Figliolini and Heim who informed him, not Catizone.

With respect to the Taris transaction, Catizone testified that Wolff advised him that since Heim and his partner, Kaufman, were Swiss nationals fluent in both German and English, and since the target for the acquisition was European, Catizone should resign from the board of directors so that a German-speaking board could be installed.

Wolff credibly testified that his involvement in the CGS and Taris matters started after agreement was reached on the terms of each deal. At the request of Figliolini and Heim, he represented the corporations by conducting due diligence of the target corporations and preparing the acquisition documents and attendant proxy materials and board minutes. He had direct contact with Catizone only insofar as he delivered to Catizone the payment for Catizone's shares, and prepared, for Catizone's signature, resignation forms and letter agreements pursuant to which Catizone agreed to vote his CGS and Taris shares in favor of the acquisitions.

I find that Wolff's preparation of the documents was done on behalf of CGS and Taris, and not on behalf of Catizone. His delivery of the purchase price to Catizone was on behalf of the purchasers of Catizone's shares. In addition to Wolff's testimony, there are letters from Wolff to Catizone regarding payment for the shares. The first letter, dated April 18, 1994, reads: "Enclosed herewith on behalf of my client and as payment in full as per agreement for the purchase of 7,854,000 shares of CGS Units, Inc. represented by Certificate No. B 1236 is my check payable to your order in the sum of $20,000." (Pl. Ex.62.) The second letter, dated March

28, 1994, reads: "On behalf of Mr. Werner Heim and in accordance with your written agreement acknowledging the sale of 6,400,000 shares of Taris, Inc .... for a total purchase price of $110,000, please find my checks numbered 0088 and 0089 in the sums of $6,400 and $103,600 respectively." (Pl.Ex.87.) Wolff testified that the purchasers of Catizone's CGS and Taris shares had deposited money into his client account, and that he drew these checks to Catizone on that account.

Catizone points to certain language in the CGS Acquisition Agreement as evidence that Wolff was his attorney in the CGS deal. (Pl.Ex. 16 at 1, 19.) The introductory paragraph of the Acquisition Agreement identifies Catizone and Figliolini as the "Principals," and a paragraph on page 19 lists as a condition precedent to the acquisition the delivery of a legal opinion by "Gary B. Wolff, P.C., counsel to the Acquiror and Principals." (*Id.*) Wolff testified credibly that the Acquisition Agreement was a form document that he completed by filling in the blanks. He testified credibly that CGS was his only client in connection with the CGS acquisition.

Catizone is knowledgeable in securities matters. He was a broker-dealer for a number of years. I do not believe his testimony that Wolff gave him legal advice on the CGS and Taris matters, or undertook to explain to him the implications of the resignation and voting agreement documents.

*5. No exclusion of Catizone by Wolff.* There is no evidence that Wolff ever excluded Catizone from discussions with the new principals of CGS or Taris in order to protect the interests of CGS and Taris. On the other hand, there is no credible evidence that group discussions with Wolff were ever held. Thus, this factor does not assist in determining whether there was an attorney-client relationship between Wolff and Catizone in 1994.

■ *6. Catizone's belief that Wolff was representing him was not reasonable.* Catizone testified repeatedly that he believed that Wolff was representing him in the 1994 CGS and Taris transactions. However, a party's unilateral belief that he is represented does not confer upon him the status of client unless there is a reasonable basis for his belief. *Solondz v. Barash,* 225 A.D.2d 996, 998, 639 N.Y.S.2d 561, 564 (3d Dep't 1996).

Catizone testified that the basis for his belief was that Wolff had always represented him in securities matters in the past. But Wolff represented Catizone personally on only a handful of securities matters, and the most recent such representation was in October 1989, more than four years before the unrelated transactions at issue. "The fact that an individual has previously been represented by an attorney does not mean that that attorney represents that person for any or all subsequent, unrelated ... matters." *Heine v. Colton, Hartnick, Yamin & Sheresky,* 786 F.Supp. 360, 366 (S.D.N.Y.1992) (quoting *People v. Ellis,* 91 Misc.2d 28, 35, 397 N.Y.S.2d 541, 545 (Sup.Ct.1977)).

There is no credible evidence that Wolff either affirmatively led Catizone to believe that he was acting as Catizone's attorney or knowingly allowed Catizone to proceed under that misconception. *See Solondz v. Barash,* 225 A.D.2d 996, 998, 639 N.Y.S.2d 561, 564 (3d Dep't 1996).

In addition, Wolff played no role in the 1994 negotiations, attended no bargaining sessions with Catizone, was not paid by Catizone, had not represented Catizone for four years, and was selected to work on the deals by Figliolini and Heim (rather than Catizone). On the basis of all of these facts, it was not reasonable for Catizone to believe that Wolff was acting as his attorney in the 1994 CGS and Taris matters, even though Wolff had represented Catizone on other transactions before 1990.

*Conclusion.* After weighing the conflicting testimony of Catizone and Wolff and

the documentary evidence, I find that Catizone has not proved by a preponderance of the credible evidence that Wolff was his lawyer on the CGS and Taris transactions. The five relevant factors all indicate the absence of an attorney client relationship. Therefore, Catizone's malpractice claim is dismissed.

### B. Breach of Fiduciary Duty

■ Most of the fiduciary duty cases cited by Catizone involved an attorney-client relationship. Under New York law, the role of a lawyer vis-a-vis the interests of his client is that of a fiduciary. *Greene v. Greene,* 56 N.Y.2d 86, 92, 451 N.Y.S.2d 46, 436 N.E.2d 496 (1982); *see also Graubard Mollen Dannett & Horowitz v. Moskovitz,* 86 N.Y.2d 112, 118, 629 N.Y.S.2d 1009, 653 N.E.2d 1179 (1995); *U.S. Ice Cream Corp. v. Bizar,* 240 A.D.2d 654, 655, 659 N.Y.S.2d 492, 493 (2d Dep't 1997); *Condren v. Grace,* 783 F.Supp. 178, 182 (S.D.N.Y.1992). However, since Wolff was not serving as Catizone's attorney in 1994, Catizone cannot base his breach of fiduciary duty claim on the existence of an attorney-client relationship between them.

In one case cited by Catizone, *Croce v. Kurnit,* 565 F.Supp. 884, 890 (S.D.N.Y. 1982), *aff'd,* 737 F.2d 229 (2d Cir.1984), which has been followed in several other decisions, the defendant attorney was treated as a fiduciary of the plaintiffs even though they were not clients. The *Croce* court held that the attorney's introduction to the plaintiffs by his business partners as "the lawyer," his explanation to the plaintiffs of the terms of several contracts that the plaintiffs signed, his interest as a principal in the transactions, and his failure to advise the plaintiffs to obtain outside counsel, taken together, established both a fiduciary duty on the part of the attorney to the plaintiffs and his breach of that duty. *Id.* In *Croce,* the court noted that "a fiduciary duty arises when a lawyer deals with persons who, although not strictly his clients, he has or should have reason to believe rely on him." *Id.*

This case is distinguishable from *Croce* and the cases that follow it because Catizone has not shown by a preponderance of the evidence that Wolff had or should have had reason to believe that Catizone was relying on him. Wolff credibly testified that he stopped personally representing Catizone in 1990 after he discovered that persons associated with a company in which Catizone had an interest, Memory Metals, were, he believed, violating the law. Wolff testified that upon this discovery he informed Catizone that he would no longer represent him. Wolff's testimony is buttressed by evidence showing that he sent Catizone's file to another attorney in 1990.

Given this decisive action by Wolff and Catizone's sophistication in securities matters, I conclude that Wolff had no reason to believe that Catizone would rely on him as an attorney after 1990. Thus, Catizone's claim for breach of fiduciary duty fails.

### C. Fraud

■ Catizone argues that Wolff's failure to disclose Wolff's own receipt of shares constituting part of the 5% pre-acquisition shares in CGS and Taris was fraudulent. Catizone has not proven fraud. All of the cases on which Catizone relies are suits between one contracting party and another. *See, e.g., Schlaifer Nance & Co. v. Estate of Warhol,* 119 F.3d 91 (2d Cir. 1997) (licensing company suing estate of artist, party to licensing agreement); *Lind v. Vanguard Offset Printers, Inc.,* 857 F.Supp. 1060 (S.D.N.Y.1994) (buyer of stock suing seller of stock). Wolff took no part in the negotiation of either the Taris or the CGS deal with Catizone. Additionally, as discussed above, Wolff did not have a relationship with Catizone that gave rise to a duty to disclose that the companies would compensate him for his services with stock. Moreover, there is no evidence as to when Wolff knew about this compensation. Accordingly, the claim that Wolff defrauded Catizone is dismissed.

### D. Constructive Trust

Since Catizone has not carried the burden of proof on his substantive claims for relief, the remedy of a constructive trust is unavailable.

### E. Counterclaims

Wolff brought two counterclaims, for extortion and conversion. Wolff did not present evidence showing his right to recover on either counterclaim.

The second counterclaim was dismissed from the bench. In a letter dated October 8, 1999, Wolff in effect moved for reconsideration of that bench ruling. That motion is denied.

### CONCLUSION

The foregoing shall constitute my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). The Clerk is directed to enter judgment for defendant on plaintiff's claims, and to enter judgment for plaintiff on defendant's counterclaims. SO ORDERED.